Florence FLAST, Albert Shanker, Helen D. Henkin, Frank Abrams, C. Irving Dwork, Florine Levin, and Helen D. Buttenwieser, Plaintiffs,

v.

John W. GARDNER, as Secretary of the Department of Health, Education and Welfare of the United States, and Harold Howe, 2d, as Commissioner of Education of the United States, Defendants.

No. 66 Civ. 4102.

United States District Court
S. D. New York.
April 27, 1967.

Leo Pfeffer, New York City, for plaintiffs; Joseph B. Robison, Donald M. Kresge, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, for defendants; Arthur S. Olick, Michael Hess, Asst. U. S. Attys., of counsel.

FRANKEL, District Judge.

The seven plaintiffs·brought this suit to enjoin the use of federal funds (1) to finance instruction in reading, arithmetic, and other subjects in religious and sectarian schools, and (2) for the purchase of textbooks and other instructional materials for use in such schools. They allege that defendants have been and are using federal funds for these purposes in administering Titles I and II of the Elementary and Secondary Education Act of 1965, 79 Stat. 27 et seq. (1965), 20 U.S.C. §§ 241a–l, 821–827 (Supp.1966). Properly construed, plaintiffs allege, the Act does not authorize such federal expenditures. If it does, they further contend, the statute must be struck down under the First Amendment, both as a "law respecting an establishment of religion" and as a "law * * * prohibiting the free exercise thereof * * *."

The complaint asserts that plaintiffs pay federal income taxes; that they are "qualified legal voters of the United States;" that they reside and vote in New York State; that one plaintiff (Shanker) is a "real property taxpayer" in New York; and that another (Henkin) "has children regularly registered in and attending the elementary or secondary grades in the public schools of New York." Invoking the court's jurisdiction under 28 U.S.C. §§ 1331, 2201, 2202, 2282, and 2284, plaintiffs have moved under the last two sections for the convening of a three-judge court. Defendants have moved under Fed.R. Civ.P. 12(b) for dismissal of the complaint on the ground that plaintiffs lack standing to sue.

The parties are agreed that a three-judge court should be convened unless plaintiffs' claims under the Federal Constitution are "plainly unsubstantial." Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed.2d 152 (1933). It seems also to be agreed—and the court would hold, in any event—that the substantive issues plaintiffs raise under the First Amendment are not "plainly unsubstantial," however those issues, if they are reached, may ultimately be resolved. Defendants urge, however, that the absence of standing is so clear that the action must be dismissed at this stage by a single judge. And it is common ground that the test of substantiality should be applied to the question of standing in determining whether there is basis for the calling of a three-judge court.

The able briefs on both sides focus upon the decision in Frothingham v. Mel-

lon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), where a taxpayer sought unsuccessfully to enjoin administration of the Maternity Act of 1921, claiming that the statute invaded the powers reserved to the States under the Tenth Amendment and otherwise exceeded the constitutional authority of the Congress, so that its effect was to take the taxpayer's property, "under the guise of taxation, without due process of law." Id. at 480, 43 S.Ct. at 598. In a brief opinion which has led since to a good deal of exegetical writing, the Supreme Court held that the interest of a taxpayer in the national fisc "is shared with millions of others; is comparatively minute and undeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." Id. at 487, 43 S.Ct. at 601. Accordingly, the Court said, considering the separate powers of the separate branches under the Constitution, the taxpayer, as such, cannot make the showing, requisite for judicial review of a statute, "that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." Id. at 488, 43 S.Ct. at 601.

The doctrine of *Frothingham,* defendants urge, "is dispositive of this case." Their argument is a powerful one. It may well be accepted ultimately as the obligatory ground for decision at the district court level. It has lately been held by another district judge to be so clearly correct as to require dismissal of a similar suit without the summoning of a three-judge court. Protestants and

Other Americans United v. United States 266 F.Supp. 473, S.D.Ohio, 1961.[1] Nevertheless, with all deference to that Court, the claim of the present plaintiffs to standing does not appear to fall to the level of *plain* unsubstantiality warranting dismissal by a single judge.

1. Even apart from the possibly material distinctions between the First Amendment problem here and the purely economic interest asserted in *Frothingham,* that decision has been the subject of weighty criticism in the years since 1923. See, e. g., Public Affairs Associates, Inc., v. Rickover, 369 U.S. 111, 114–115, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962) (Douglas, J., concurring); Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv.L.Rev. 1265, 1266, 1284 (1961); 3 Davis, Administrative Law, Sec. 22.09 (1958); Davis, "Judicial Control of Administrative Action": A Review, 66 Colum.L.Rev. 635, 659–669 (1966); Wright, Federal Courts 37 (1963). The critics have noted, among other things, that the nature of taxpayers' interests has changed as the size of the economy and government has burgeoned in the period of almost half a century since *Frothingham.* The interest of state taxpayers in the treasuries of at least several large States may be even more "remote, fluctuating and uncertain" than Frothingham's federal interest in 1923. Yet state taxpayers retain their standing to raise federal constitutional issues in the Supreme Court. The arguable point of this is that *Frothingham* does not announce a limitation on standing compelled by Article III of the Constitution—and, indeed, as plaintiffs stress, the decision was not expressly stated to rest upon such a mandate.

There are answers, perhaps complete ones, to that thought. But it does not

---

1. The complaint in that case, similarly attacking the Elementary and Secondary Education Act, contained a prayer on behalf of the individual plaintiffs for damages of $5,000,000. It may be permissible to say, even at this far remove, that this grandiose novelty may have appeared to sound a somewhat bizarre note. Strictly speaking, however, the decision of the Ohio District Court goes squarely on *Frothingham,* and does not indicate that any significance was attached to the prayer for damages in reaching the conclusion that the plaintiffs patently lacked standing.

seem either necessary or appropriate to pursue them to any final conclusions. The limited office of this memorandum is to sketch arguments which appear to defeat defendants' assertion of plain unsubstantiality.

2. Defendants make the point that the Senate has recently passed a bill (S. 3, 90th Cong., 1st Sess.)—identical with a bill passed by the Senate, but not the House, in the prior Congress—which would give to any federal taxpayer the right to raise in a suit for a declaratory judgment the First Amendment questions tendered here, with no "additional showing of direct or indirect financial or other injury, actual or prospective, on the part of the plaintiff * * * required for the maintenance of any such action." Sec. 3(a).[2] "The very fact that such legislation is before the Congress," defendants argue, "demonstrates that this Court is without jurisdiction to consider the merits of the present controversy."[3] There is room for argument, however, that the Senate's action "demonstrates"—or, at least, suggests—other things.

The report on S. 3, S. Rep. No. 85, 90th Cong., 1st Sess. (1967), reflects careful study and the participation of notable scholars. It outlines not only the deliberations of the Committee on the Judiciary, but the participation in the legislative drafting of the Attorney General and the Solicitor General (id., p. 2) —both, along with the Senate, bound by and sensitive to the pertinent commands of the Constitution. And it states the studied conclusion that "the *Frothingham* decision was founded on grounds other than purely constitutional ones." Id., p. 4. Indeed, the passage of the bill by the Senate rests upon the weighty, if not final, judgment that this conclusion is correct. Cf. Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

As to the separation of powers, the report on S. 3 contains this interesting passage (p. 7.):

"One of the initial sponsors of this legislation, Senator Wayne Morse, declared in his testimony before the subcommittee: 'I think we will greatly strengthen our whole system of three coordinate and coequal branches of government if we provide in a broad bill a jurisdictional basis for judicial review.' The bill recognizes that the final power to adjudicate controversies arising under the Constitution rests in the courts rather than the Congress."

The report also contains material favorable to defendants' view. Considering the narrow scope of the present memorandum, there is no need to exhaust this material, but one passage should certainly be quoted (ibid.):

"Several cases are now pending which challenge the constitutionality of the Elementary and Secondary Education Act of 1965. The pendency of these cases may be cited by opponents of judicial review as a substitute for legislation. The committee feels, however, that if the question of standing is raised by the defendants in these cases, they will undoubtedly be successful under the present state of the law."

Contrary to that observation, this court is proceeding on the view that the ultimate success of defendants on the standing issue is not "undoubtedly" assured. Taking altogether the work of the Senate and its Committee on this subject, we find in it enough suggestion of plausible doubt to add weight to plaintiffs' thesis that they have enough to justify the attentions of a three-judge court.

3. Continuing only to ask whether plaintiffs show the requisite minimum of substance, it bears mention that respectable arguments may flow from the dif-

---

2. Subsection (b) of Section 3 of the bill goes on to give standing far more sweepingly to "[a]ny citizen," and "citizen" is defined in subsection (c) to include a corporation. Both the taxpayer provision and the broader "citizen" subsection confer upon plaintiffs the right to bring their actions as broad class suits.

3. Defendants' Reply Memorandum, p. 4.

ference in subject matter between *Frothingham* and this case, and from related differences in the asserted bases for the claim of standing. The alleged injury here is not merely, or mainly, economic loss. And the roles in which plaintiffs allege injury are not simply their roles as taxpayers. When the Founders proscribed laws "respecting an establishment of religion," their aim, as Madison described it, was to make it impossible "to force a citizen to contribute three pence only of his property for the support of any one [church] establishment * * *" Memorial and Remonstrance Against Religious Assessments, quoted in Everson v. Board of Education, 330 U.S. 1, 63–66, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (Appendix to dissent of Rutledge, J.). It is banal but relevant to say that the concern was not over the three pence. The concern was with a specially cherished form of spiritual and intellectual freedom. And so it is arguable that the essentially economic analysis in *Frothingham* cannot be dispositive in a case of this kind.

It may not be unfair in this connection to note that defendants' argument would extend logically to the case of a federal appropriation for the building of a cathedral for some particular sect. Assuming that no taxpayer as such would have standing because of *Frothingham,* would it follow that nobody had standing to attack such an expenditure? Could it be assailed, for example, by people of different religions or no religion living in the neighborhood of the proposed structure? If it could, it may turn out that the allegations of the present plaintiffs concerning their interests as parents and holders of real property have weight on the standing question of a kind wholly absent from *Frothingham.*

■ The First Amendment forbids not only aid to religions, but actions that might "influence a person to go to or to remain away from church against his will * * *." Everson v. Board of Educa-

tion, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). It could rationally be contended that financial support of sectarian institutions may exert an impermissible "influence" upon persons outside the aided groups. The argument may not succeed in the final analysis. But it serves as a suggestion of additional grounds for claiming that the standing of the present plaintiffs is more broadly based than was the taxpayer status of Mrs. Frothingham.

■ 4. The foregoing thoughts merely graze an enormous area that has been the subject of lengthy and difficult opinions by the Supreme Court in recent years. The general drift of First Amendment jurisprudence may plausibly be appraised as moving toward increasingly relaxed criteria for the achievement of standing to sue. See, e. g., School District of Abington Township v. Schempp, 374 U.S. 203, 266 n. 30, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); Dombrowski v. Pfister, 380 U.S. 479, 486–487, 85 S.Ct. 1116, 14 L.Ed. 2d 22 (1965); Reed Enterprises v. Corcoran, 122 U.S.App.D.C. 387, 354 F.2d 519, 523 (1965); Kurland, "The Regents' Prayer Case." The Supreme Court Review (1962). This is not the time to essay a final analysis of the movement—to determine, among several questions, how far the cases attacking state action should be deemed inapposite in the federal area even though it is the "Congress" to which the First Amendment was first and literally addressed. It is enough that the potential results of such an analysis are not predictable with the certainty that would warrant dismissal of plaintiffs' action by a single judge.

Accordingly, the motion to convene a three-judge court will be granted, and the matter will be referred to the Chief Judge of this Circuit for that purpose. Defendants' motion to dismiss will be held for the decision of the three-judge court.

It is so ordered.