Florence **FLAST**, Albert Shanker, Helen D. Henkin, Frank Abrams, C. Irving Dwork, Florine Levin and Helen L. Buttenwieser, Plaintiffs,

v.

John W. **GARDNER**, as Secretary of the Department of Health, Education and Welfare of the United States, and Harold Howe, 2d, as Commissioner of Education of the United States, Defendants.

**No. 66 Civ. 4102.**

United States District Court
S. D. New York.

Argued May 25, 1967.

Decided June 19, 1967.

Probable Jurisdiction Noted
Oct. 16, 1967.

See 88 S.Ct. 218.

See also D.C., 267 F.Supp. 351.

. Leo Pfeffer, New York City (Joseph B. Robison and Donald M. Kresge, New York City, on the brief), for plaintiffs.

Arthur S. Olick, New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Michael D. Hess, Asst. U. S. Atty., on the brief), for defendants.

Thomas F. Daly, New York City (Lord, Day & Lord, Julius Berman, New York City, Reuben E. Gross, Staten Island, N. Y., and Marcel Weber, New York City, on the brief), for proposed intervenors.

Before HAYS, Circuit Judge, and Mc-GOHEY and FRANKEL, District Judges.

HAYS, Circuit Judge:

This is an action to enjoin the defendants from using federal funds to finance guidance services and instruction in reading, arithmetic and other subjects in religiously operated schools, and to prevent the expenditure of federal funds for the purchase of textbooks and other instructional materials for use in such schools. It is alleged that defendants are using federal funds for these purposes

in administering Titles I and II of the Elementary and Secondary Education Act of 1965, 20 U.S.C. §§ 241a–241l, 821–827 (Supp. I, 1965).

Plaintiffs requested that a three-judge court be convened pursuant to 28 U.S.C. §§ 2282, 2284 to consider their contention that if these expenditures are authorized by the Act the statute constitutes a "law respecting an establishment of religion" and a law "prohibiting the free exercise thereof" in violation of the First Amendment to the Constitution of the United States. Defendants opposed the application for the convening of a three-judge court and moved to dismiss the complaint on the ground that plaintiffs lack standing to sue. The application for a three-judge court was granted. See Flast v. Gardner, 267 F.Supp. 351 (S.D.N.Y.1967). We must decide defendants' motion to dismiss the complaint.

A group of parents whose children attend religiously operated schools and receive or are eligible to receive special educational help available under the Elementary and Secondary Education Act of 1965 have requested leave to intervene as defendants in this action.

We hold that plaintiffs have no standing to bring this action, that there is thus no justiciable controversy and this court therefore lacks jurisdiction of the subject matter. Our disposition of the case makes it unnecessary, for reasons set out more fully below, to pass on the application for intervention.

### I.

The issue of plaintiffs' standing has been presented separately and we have received briefs and heard argument only on this preliminary issue.

It is clear that if plaintiffs have standing to sue it is because they pay federal income taxes.

Consideration of the standing of a federal taxpayer to sue to prevent the depletion of the federal treasury caused by the expenditure of federal funds for unconstitiuonal purposes must begin with the Supreme Court's decision in Froth-

ingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). In that case a taxpayer sought to enjoin administration of the Maternity Act of 1921 which provided for the appropriation of federal funds to combat maternal and infant mortality. The taxpayer claimed that by enacting the statute Congress had exceeded its powers and had usurped powers reserved to the states by the Tenth Amendment to the Constitution, and that the effect of the appropriation would be "to increase the burden of future taxation and thereby take her property without due process of law." 262 U.S. at 486, 43 S.Ct. at 600.

The Supreme Court distinguished cases permitting municipal taxpayers to sue to enjoin the expenditure of municipal funds and stated that the interest of a federal taxpayer "in the moneys of the treasury * * * is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." 262 U.S. at 487, 43 S.Ct. at 601.

The Court held that a federal taxpayer, as such, cannot make the showing, necessary for obtaining judicial review of a statute, "that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." 262 U.S. at 488, 43 S.Ct. at 601.

Plaintiffs contend that the *Frothingham* decision establishes a rule of judicial self-restraint rather than a limitation on the jurisdiction of the federal courts under Article III, Section 2 of the Federal Constitution. They argue that viewed as an expression of the policy of judicial self-restraint the *Frothingham* rule has no application to issues arising out of the Free Exercise and Establishment Clauses of the First Amendment.

Since the *Frothingham* decision is binding on this court regardless of

whether it states a constitutional principle or a rule of policy, we need not consider the much debated question whether the rule is one of constitutional dimension.[1] Moreover, plaintiffs' attempt to distinguish *Frothingham* on the ground that the instant litigation involves rights protected by the First Amendment must be rejected in light of the Supreme Court's decision in Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). In that case a group of taxpayers sought a judgment declaring unconstitutional under the Establishment Clause a New Jersey statute that provided for the reading of verses from the Old Testament at the beginning of each school day. The Supreme Court, citing Frothingham v. Mellon and quoting from its opinion in that case, held that plaintiffs lacked standing to raise this First Amendment claim:

> "Without disparaging the availability of the remedy by taxpayer's action to restrain unconstitutional acts which result in direct pecuniary injury, we reiterate what the Court said of a federal statute as equally true when a state Act is assailed: 'The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.' [Commonwealth of] Massachusetts v. Mellon, supra [262 U.S.], at 488 [43 S.Ct. at page 601.]

It is true that this Court found a justiciable controversy in Everson v. Board of Education, 330 U.S. 1 [67 S.Ct. 504, 91 L.Ed. 711.] But Everson showed a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of. This complaint does not.

We do not undertake to say that a state court may not render an opinion on a federal constitutional question even under such circumstances that it can be regarded only as advisory. But, because our own jurisdiction is cast in terms of 'case or controversy,' we cannot accept as the basis for review, nor as the basis for conclusive disposition of an issue of federal law without review, any procedure which does not constitute such.

The taxpayer's action can meet this test, but only when it is a good-faith pocketbook action. It is apparent that the grievance which it is sought to litigate here is not a direct dollars-and-cents injury but is a religious difference. If appellants established the requisite special injury necessary to a taxpayer's case or controversy, it would not matter that their dominant inducement to action was more religious than mercenary. It is not a question of motivation but of possession of the requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct. We find no such direct and particular financial interest here." 342 U.S. at 434–435, 72 S.Ct. at 397. See, e. g., Elliott v. White, 57 App.D.C. 389, 23 F.2d 997 (1928); Protestants and Other Americans United for Separation of Church & State v. United States, 266 F.Supp. 473 (S.D.Ohio 1967); cf. School District of Abington v. Schempp, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); 111 Cong.Rec. 7317–18 (1965); S.Rep.No. 85, 90th Cong., 1st Sess. 5–7, 17–18 (1967).

As the quoted material makes clear, Everson v. Board of Education, 330 U.S.

---

1. See, e. g., Doremus v. Board of Education, 342 U.S. 429, 434–435, 72 S.Ct. 394, 96 L.Ed. 475 (1952); Davis, "Judicial Control of Administrative Action": A Review, 66 Colum.L.Rev. 635, 666 (1966); 3 Davis, Administrative Law, § 22.09, at 243 (1958) and § 22.10, at 64 (Supp. 1965); S.Rep.No.85, 90th Cong., 1st Sess. 4 (1967); Hearings Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 2d Sess., Part 2, 492–501 (1966) (Statements of Professors Davis, Griswold and Freund); 111 Cong.Rec. 6131–32 (1965) (remarks of Representative Celler).

**4**

1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) does not support plaintiff's position since that action was brought by a local taxpayer whose economic interests were directly affected by local school board expenditures. Inapposite too are cases such as School District of Abington v. Schempp, supra, Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); and [People of State of Illinois] ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S. Ct. 461, 92 L.Ed. 649 (1948). In each of these cases the plaintiffs were either children attending public schools or their parents who were "directly affected by the laws and practices against which their complaints are directed." School District of Abington v. Schempp, supra, 374 U.S. at 224 n. 9, 83 S.Ct. 1560 at 1572; see Zorach v. Clauson, supra, 343 U.S. at 309 n. 4, 72 S.Ct. 679; cf. McGowan v. [State of] Maryland, 366 U.S. 420, 429–431, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

Finally, although the *Frothingham* rule has been criticized[2] the case has never been overruled or limited by the Supreme Court;[3] indeed, the citation of *Frothingham* in the recent case of Abbott Laboratories v. Gardner, 387 U.S. 136, 153, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) attests to its continuing vitality. That the Senate has recently passed a bill for the express purpose of creating an exception to the *Frothingham* rule by conferring standing on any federal taxpayer to raise the First Amendment questions tendered here (see S. 3, 90th Cong., 1st Sess.; S.Rep.No. 85, 90th Cong., 1st Sess. 4–7 (1967)), further supports our conclusion.

## II.

Our disposition of the case makes it unnecessary for us to pass upon the application for intervention. The involvement of the proposed intervenors in the consideration of the motion to dismiss could not have been greater had the motion to intervene been granted. They have filed briefs and participated in oral argument. The contention on which they base their claim that their interests will not be adequately represented by the present defendants, that if the Elementary and Secondary Education Act did not confer equal benefits on parochial school children it would interfere with their right of free exercise of their religion, would be material only if this court were to reach the merits of plaintiffs' complaint. Since we do not reach the merits we need not decide whether this argument of the proposed intervenors requires that permission to intervene be granted.

The Clerk is directed to dismiss the complaint for lack of jurisdiction of the subject matter.

FRANKEL, District Judge (dissenting):

There is no disagreement among us as to the principle that we ought almost invariably to follow rather than anticipate Supreme Court precedents. Unless the Supreme Court has made perfectly clear that one of its earlier cases is about to be overruled,[1] or unless a decision has been eviscerated without benefit of Shepard's formal rites,[2] we are to adhere faithfully to the precedents given

---

2. See, e. g., Davis, "Judicial Control of Administrative Action": A Review, 66 Colum.L.Rev. 635, 659–69 (1966); Davis, Administrative Law, § 22.09 (1958); Hearings Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 2d Sess., Part 2, 492–96, 498–500 (1966); but see Dean Griswold's view, Hearings, supra, 496–97 (1966); Note, Taxpayers' Suits: A Survey and Summary, 69 Yale L.J. 895, 918–19 (1960).

3. But cf. Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 114, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962) (concurring opinion).

1. See Barnette v. West Virginia Board of Ed., 47 F.Supp. 251, 252–253 (S.D.W.Va. 1942), aff'd 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

2. See Gold v. DiCarlo, 235 F.Supp. 817, 818–820 (S.D.N.Y.1964), aff'd, 380 U.S. 520, 85 S.Ct. 1332, 14 L.Ed.2d 266 (1965).

us at our time of decision. Granting the force of these principles, I cannot agree that the course we should follow here is charted by Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), or any other single decision. The Supreme Court has never confronted directly the troublesome question of standing we have in this case. And I believe that the doctrines of the Court's decisions relevant to our inquiry entail a conclusion contrary to that of the majority. Accordingly, with the utmost deference, I must respectfully dissent from the decision that plaintiffs lack standing.

In organizing the thoughts leading to this conclusion, it has seemed convenient to begin with an affirmative statement of the reasons for holding that plaintiffs have standing, and to turn then to the grounds for distinguishing *Frothingham*. I shall proceed in that order.

### I.

It is appropriate, whether or not it should be necessary, to emphasize at the outset that our divergent conclusions on standing import no views as to whether plaintiffs would ultimately prevail on the merits. See Baker v. Carr, 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Given only that the issues posed under

the First Amendment are not frivolous,[3] the issue decided today could not be affected by a forecast, if we made one, that the complaint must ultimately be dismissed on substantive grounds. Cf. Bell v. Hood, 327 U.S. 678, 683, 66 S.Ct. 773, 90 L.Ed. 939 (1946). On the other hand, to complete the perspective, the Government acknowledges that its arguments opposing plaintiffs' standing would be no different if the case involved federal appropriations to build churches for particular sects—i. e., presumably clear violations of the First Amendment's ban against laws "respecting an establishment of religion * * *."[4]

In a word, the issue decided today may be stated this way: Does a plaintiff, suing as a federal "citizen and taxpayer," assert "a legally cognizable injury," sustained by him, Baker v. Carr, supra, at 208, 82 S.Ct. 691, when he alleges that a federal statute authorizes, or is being applied to grant, support for one or more religious establishments? "The touchstone * * * is injury to a legally protected right * * *." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 140–141, 71 S.Ct. 624, 632, 95 L.Ed. 817 (1951) (opinion of Burton, J., joined by Douglas, J.). The asserted right "may be based on an interest created by the Constitution or a

3. A proposition earlier, and properly, conceded by defendants. The Government moved for dismissal by a single judge, without convening a three-judge court, when the case first came to me, on the sole ground that the claim of *standing* lacked sufficient substance to be heard by three judges. It was acknowledged at the time that no similar contention was being made with respect to the merits of the complaint. Cf. Department of Health, Education, and Welfare, Memorandum on the Impact of the First Amendment to the Constitution upon Federal Aid to Education, 50 Geo.L.J. 349 (1961).

4. This concession by the Government, though not binding upon us, would seem inevitable as a matter of the logic and intellectual honesty that have characterized the efforts of government counsel in this case as in others. No less properly, government counsel noted that the unlikely case of an appropriation to build

a church might fortuitously give standing to someone other than a taxpayer—e. g., a property owner resisting condemnation of his land for the questioned purpose. But that sort of remotely possible happenstance does not basically affect the dimensions of the problem. Moreover, it would not be pertinent to other hypotheticals that could be put—for example, the use of government funds to pay the salaries of clerics, to support existing religious structures, etc. In strict logic, the issue of standing remains separate, preliminary, and unchanged throughout, though it is fair to recognize that some non-logical nerve may tingle when the stark proposition is put that concededly unlawful or unconstitutional action is in effect immune from judicial scrutiny. Cf. Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed. 210 (1958).

statute." Id. at 152, 71 S.Ct. at (Frankfurter, J., concurring); see also Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 64 n. 6, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Alabama Power Co. v. Ickes, 302 U.S. 464, 475, 478–479, 58 S.Ct. 300, 82 L.Ed. 374 (1938).

Another, more recent, and obviously pertinent formulation of the concept is this: "Have the [plaintiffs] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing." Baker v. Carr, supra, at 204, 82 S.Ct. at 703.

Appraising the substantive character of the wrong asserted in the complaint in light of the foregoing definitions, it seems reasonably clear to me that plaintiffs have standing to maintain this suit. They allege the vividly personal, vital, intimate, and grave hurt against which the Establishment Clause · was meant to guard. And unless they can sue to redress this kind of grievance, the first of the "preferred freedoms" safeguarded by the First Amendment is substantially unenforceable against federal violations, to which the Amendment was initially, and for a long time exclusively, directed.[5]

*1. The Establishment Clause forbids the use of tax money to support any religion, and confers an enforceable "right" upon the federal taxpayer claiming this basic protection.[6]*

It is now familiar to all who have touched this subject that a central concern—perhaps the most central concern—of the Establishment Clause is to ban utterly the use of public moneys to support any religion or all religions. The history is reviewed in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and there is no reason to repeat at length what the Supreme Court has said there and elsewhere. It is sufficient to recall that both the majority and the dissenters in that case recognized, affirmed, and undertook to apply the vital First Amendment principle forbidding the "support" of churches through the exaction of "taxes and tithes." See, e. g., 330 U.S. at 8, 9, 10, 11, 67 S.Ct. at 507, 508, 509, id. at 21, 22, 24, 26, 67 S.Ct. at 514, 515, 516 (Jackson, J., dissenting); id. at 32, 33, 36–37, 40–41, 43, 44–45, 67 S.Ct. at 519, 520, 521, 522, 523, 525, 526 (Rutledge, J., dissenting).[7]

5. The Establishment Clause is literally the first one in the First Amendment. It may be acknowledged in passing that this does not elevate it above the rest of the Article. See Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 164, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The point approaches pedantry, however; it should be enough to note the familiar principle that the whole of the First Amendment occupies a "preferred position" (id. at 164, 167, 64 S.Ct. 438) in our constitutional firmament and is most notably and singularly in the domain of the personal liberties entitled to judicial protection.

6. This dissent is confined to the proposition that plaintiffs have standing to assert their claim under the Establishment Clause. As the complaint now stands, it seems unlikely that they could also demonstrate standing under the Free Exercise Clause, on which they also count. See McGowan v. State of Maryland,

366 U.S. 420, 429–430, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). While it probably makes no practical difference, if my views had prevailed, decision of the latter question could have been postponed until the court had a full record on the merits of plaintiffs' claims, possibly including some pertinent amendments to the complaint to conform to what might ultimately be proved.

7. The fullest account of the point is in the dissent of Mr. Justice Rutledge, who printed as an Appendix Madison's Memorial and Remonstrance against Religious Assessments of 1785. 330 U.S. at 63 et seq., 67 S.Ct. 504. Although in dissent, what Mr. Justice Rutledge wrote and collected there has continued to be cited by the Court to reflect the agreed understanding of the evils that generated, and were meant to be proscribed by, the Establishment Clause. See, e. g., School District of Abington v. Schempp, 374 U.S. 203, 218–19, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963);

" * * * The imposition of taxes to pay ministers' salaries and to build and maintain churches and church property aroused their indignation. * * * It was these feelings which found expression in the First Amendment. * * * Virginia, where the established church had achieved a dominant influence in political affairs and where many excesses attracted wide public attention, provided a great stimulus and able leadership for the movement. The people there, as elsewhere, reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions, or to interfere with the beliefs of any religious individual or group." Id. at 11, 67 S.Ct. at 509.

Following the quoted passage, the Court traced the "dramatic climax in Virginia in 1785–86," the collaborative struggles of Jefferson and Madison, the latter's famous Remonstrance, and the resulting "Virginia Bill for Religious Liberty," with its ban against enforced public support of any church or religion. Id. at 11–13, 67 S.Ct. 504. And it reaffirmed (id. at 13, 67 S.Ct. at 510) "that the provisions of the First Amendment, in the drafting and adoption of which Madison and Jefferson played such leading roles, had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute."

"Support" by the use of taxpayers' money lay at the heart of Jefferson's and Madison's concern. Madison's Remonstrance, "an event basic in the history of religious liberty," (McCollum v. Board of Education, supra, 333 U.S. at 214, 68 S.Ct. at 467 (Frankfurter, J., concurring), was written, after all, to denounce proposed "religious assessments"—and, indeed, assessments to be used for "support to religious education." Ibid. In that historic document he argued successfully, and led to the First Amendment's assurance, that no federal official should be empowered to "force a citizen to contribute three pence only of his property for the support of any one establishment * * *." 330 U.S. at 65–66, 67 S.Ct. at 536. To allow even such trivial exactions, he wrote, would empower the official to force the citizen "to conform to any other establishment in all cases whatsoever * * *." Id. at 66, 67 S.Ct. at 536. And so it was essential "to take alarm at the first experiment on our liberties" (id. at 65, 67 S.Ct. at 536)—to strike, as had the "freemen of America," before usurpation had become habit "and entangled the question in precedents." Ibid.

The asserted wrong, if the Establishment Clause has been violated, is for every unwilling contributor the very kind of "support" against which the Amendment was directed. "The matter is not one of quantity, to be measured by the amount of money expended." Everson, supra, 330 U.S. at 63, 67 S.Ct. at 534 (Rutledge, J., dissenting). The separation must be "complete and unequivocal," Zorach v. Clauson, 343 U.S. 306, 312, 72 S.Ct. 679 (1952); the "slightest breach" is to be resisted. Everson, supra, 330 U.S. at 18, 67 S.Ct. 504. If there is "support," as plaintiffs here allege, then the "wall of separation" has been breached, and the evil denounced by the First Amendment has been realized.

But why the separation? Why the wall? Who, if anyone, is hurt by breaches? What is the nature of the hurt?

These questions, which ask about "standing," find recent responses in Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), where the Court recalled what the Framers had learned in their blood about the meaning of "establishment." It said, in passages perti-

---

Torcaso v. Watkins, 367 U.S. 488, 492 n. 7, 493, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); McCollum v. Board of Education,

333 U.S. 203, 210, notes 6 and 7, 68 S.Ct. 461, 92 L.Ed. 649 (1948).

nent here (id. at 430–433, 82 S.Ct. at 1267, emphasis added):

" * * * The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not. This is not to say, of course, that laws officially prescribing a particular form of religious worship do not involve coercion of such individuals. *When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.* * * * Another purpose of the Establishment Clause rested upon an awareness of the historical fact that *governmentally established religions and religious persecutions go hand in hand.* * * * The Founders knew that only a few years after the Book of Common Prayer became the only accepted form of religious services in the established Church of England, an Act of Uniformity was passed to compel all Englishmen to attend those services and to make it a criminal offense to conduct or attend religious gatherings of any other kind * * *—a law which was consistently flouted by dissenting religious groups in England and which contributed to widespread persecutions of people like John Bunyan who persisted in holding 'unlawful [religious] meetings * * * to the great disturbance and distraction of the good subjects of this kingdom * * *.' And they knew that similar persecutions had received the sanction of law in several of the colonies in this country soon after the establishment of official religions in those colonies. *It was in large part to get completely away from this sort of systematic religious persecution that the Founders brought into being our Nation, our Constitution, and our Bill of Rights with its prohibition against any governmental establishment of religion."*

Those words describe the subject matter of this lawsuit, whether or not plaintiffs are right on the merits, so far as our issue of standing is concerned. We deal with what the Bill of Rights enshrines as the most sacred of things, the hearts and the spirits of men. The claim is that the plaintiffs' money is being used in an official program which is being conducted so as to violate the First Amendment's protection of these and other citizens against the danger of coercion, thought-control, and persecution.

If we wrote on an utterly clean slate, even the fact of tax payments might be immaterial. Our direct knowledge of tyranny ought to be fresh enough to teach that there may be, in the kind of wrong against which plaintiffs complain, immediate and personal assault sufficient to comprise "legal injury." Even "novelty," after all, has not prevented the courts from recognizing "justiciability" within the framework of our constitutional scheme. Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 159, 71 S.Ct. 624 (Frankfurter, J., concurring). It should be no more difficult to identify an "injury," amounting to the beginnings of "coercion" and "persecution," so dramatically central in the concerns of those who wrote the First Amendment. It might be argued that the responsibly asserted grievance of anyone who felt the chill of threatened persecution is no less palpable a ground for standing than the complaint of a suitor who "chooses" to feel the spiritual blows struck by systems of racial segregation.[8]

8. It is now thirteen years since the erasure of the notion that racial discrimination could be deemed a "badge of inferiority * * * solely because the colored race chooses to put that construction upon it."

Plessy v. Ferguson, 163 U.S. 537, 551, 16 S.Ct. 1138, 1143, 41 L.Ed. 256 (1896), overruled in Brown v. Board of Education, 347 U.S. 483, 494–495, 74 S.Ct. 686, 98 L.Ed. 873 (1954). By now, surely,

But there is no need to reach that far. The subject is one on which volumes of history outweigh any new pages of logic we might essay at this date. It is enough, I think, that the injury asserted by the taxpayer is at the core of the right enthroned by the First Amendment. Asserting the right in its pristine form, plaintiffs are entitled to have their claim heard.

2. *A federal taxpayer should be accorded the same standing under the First Amendment as is accorded state taxpayers under Everson.*

After sketching the historical background of the First Amendment, the Court in *Everson* stated what it then, and has since, deemed the governing substantive principles (330 U.S. at 15–16, 67 S.Ct. at 511):

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*.

In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' Reynolds v. United States, supra, 98 U.S. at 164, 25 L.Ed. 244."

Applying those principles, the Court rejected (5–4) the claim of the plaintiff taxpayer that the First Amendment—there, via the Fourteenth—forbade reimbursement of parents for the bus transportation of their children to sectarian schools. But the critical points of that decision for us are not, at this stage, in the particular result on the merits. There are two beacons in the case and its aftermath that ought to guide us to our conclusion on today's question of standing:

(1) The unanimity of the Court on the proposition that the Establishment Clause forbids support of any religion from the public treasury—i. e., that the "right" protected makes it a "legal injury" to have one's money taken and used for the proscribed purpose.

(2) The fact that no doubt was suggested concerning the standing of the complaining taxpayer, in the highest Federal Court as well as in the State's courts. While the question was not discussed in *Everson,* it has since become clear that the taxpayer was properly, if tacitly, accorded such standing. See Doremus v. Board of Education, 342 U.S. 429, 434, 72 S.Ct. 394, 96 L. Ed. 475 (1952).

This second point is the decisive one. There is no basis in principle or reason for allowing a state taxpayer to attack a "law respecting an establishment of religion" while denying the same right to a federal taxpayer opposing intrusion into the forbidden area by the Federal Government, the power of which remains

---

the courts have come to know that affronts to the spirit and conscience of men may be intensely genuine precisely because they are experienced as such. Thus, as Judge Soper said for the Fourth Circuit, in rejecting arguments reminiscent of the *Plessy* era: "We must give first place to the rights of the individual citizen, and when and where he seeks only equality of treatment before the law, his suit must prevail. It is for him to decide in which direction his advantage lies." McKissick v. Carmichael, 4 Cir., 187 F.2d 949, 954, cert. denied, 341 U.S. 951, 71 S.Ct. 1021, 95 L.Ed. 1374 (1951).

more fearsome today, as it was when it comprised the exclusive concern of the Framers.

*Everson* started, of course, as the familiar form of *state* taxpayer's suit, subject at the state level to state notions about standing. However, to be heard on the merits in the Supreme Court, as he was, the appellant was required to show standing in the federal sense. If this was unclear at the time of *Everson*, it was made clear in Doremus v. Board of Education, supra, 342 U.S. at 434–435, 72 S.Ct. 394, where failure to show the "requisite financial interest" led to dismissal of the appeal because of the "case or controversy" requirement in Article III of the Federal Constitution. And it seems to be clear still that standing at any level of the federal system "is, of course, a question of federal law." Baker v. Carr, supra, 369 U.S. at 204, 82 S.Ct. at 703.[9]

Nobody has suggested that the standing accorded in *Everson*, as thus explicated, is any less clear today for a state taxpayer. That continued position supplies, in my judgment, positive and substantially square ground on which standing should be found here.

The prime point—that Article III applies indifferently to both situations—has been noted already. What else is there? In *Doremus*, the Court said Everson had shown "a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of." 342 U.S. at 434, 72 S.Ct. at 397. I do not find, at least in the *Everson* opinions, any precise "measurement" of plaintiff's tax burden. There is no suggestion whether plaintiff there had identified a nickel or a dollar or a thousand dollars of his spent for "the activities complained of."

All that was evidently meant was that the incremental money value of the time spent on the bible-reading assailed in *Doremus* was not practically "measurable" to the extent possible with respect to the reimbursed bus fares in *Everson*. And it may well have been significant that plaintiffs in *Doremus*, unlike the plaintiffs here, did not allege in their complaint any specific "appropriation or disbursement" of public funds for the bible-reading. No such obstacles exist here. The complaint is rested squarely upon alleged expenditures said to violate the Establishment Clause. If measurement is wanted in this age of computers, it can surely be had. We have only a complaint and a motion to dismiss before us. We do not know how rich the plaintiffs are or how much they pay in taxes. We do not know the size of the expenditures of which they complain. It may be that they can show measurably larger financial stakes than those of the taxpayer in *Everson*. All of this is surely knowable if anyone cares, and its omission from our barren record at this time would not in itself justify dismissal now.

I would submit, however, that measurements of this sort could hardly have been declared vital for a First Amendment claim, whatever else the quoted language of *Doremus* may have meant. While the complaint charges unconstitutional expenditures, the claimed injury relates to familiar "consequences not amenable to statistics. But they are precisely the consequences against which the Constitution was directed when it prohibited the Government common to all from becoming embroiled, however innocently, in the destructive religious conflicts of which the history of even this country records some dark pages." McCollum v. Board of Education, supra, 333 U.S. at 228, 68 S.Ct. at 473 (Frankfurter, J., concurring).

It was also said in *Doremus* (342 U.S. at 435, 72 S.Ct. at 398) that the appellants showed "no such direct and particular financial interest" as to ground

---

9. This does not require us to explore in a case begun in federal court the interesting thought, thus far not accepted in the Supreme Court, that "standing to raise a federal constitutional question" should be treated as being "itself a federal question, so that it will be decided uniformly throughout the country." Paul Freund in Cahn (ed.), Supreme Court and Supreme Law 35 (1954).

the kind of standing allowed in *Everson*. In their context, those words would appear to have referred again to the fact that the plaintiffs made no allegation that any added tax moneys were being expended for bible-reading. That pleading deficiency, as I have just noted, does not exist here. Nevertheless, there has been some suggestion in the argument before us that plaintiffs might well have a right to sue if there were a specific federal tax, separately assessed and collected, for the use they claim is forbidden. But this borders on the frivolous. The First Amendment's commands, so sensitively and astutely enforced in their essential substance under the decisions of the Supreme Court, would be trivialized if they could be avoided by details of government bookkeeping or fiscal regulation. "What may not be done directly may not be done indirectly lest the Establishment Clause become a mockery." School District of Abington v. Schempp, supra, 374 U.S. at 230, 83 S.Ct. at 1575 (Douglas, J., concurring).

It seems perfectly obvious that those who wrote the First Amendment would have been astonished by the suggestion that it might come to be enforceable *only* against the States and not against the Federal Government. The familiar words are that *"Congress* shall make no law respecting an establishment of religion \* \* \*." When they were written, they were applicable only to the Federal Government, and they remained so confined until just a generation ago.[10] It was the national power that the Founders feared and undertook to curb. See McGowan v. State of Maryland, supra, 366 U.S. at 440–442, 81 S.Ct. 1101; Everson v. Board of Education, supra, 330 U.S. at 13, 67 S.Ct. 504; Freund,

"The Legal Issue," in Religion and the Public Schools, 4, 8–9 (1965). Indeed, when they fashioned the Bill of Rights, established churches were still, if not for long, familiar in the States, and it was clear that the First Amendment left that situation untouched. See McGowan v. State of Maryland, supra, 366 U.S. at 486, 81 S.Ct. 1101 (Frankfurter, J., concurring); School District of Abington v. Schempp, supra, 374 U.S. at 214 n. 5, 83 S.Ct. 1560.

There is no question now, of course, that the First Amendment applies with full force to the States. But it is a ludicrous anomaly to close the circle, as the majority opinion does, by making at least the Establishment Clause a substantial nullity with respect to the Federal Government. See Jaffe, Standing to Secure Judicial Review: Public Actions, 74 Harv.L.Rev. 1265, 1310–11 (1961). The Supreme Court has never faced, let alone ordered, this historically and logically unacceptable paradox. Until or unless it does, and while the unanimously accepted principles of *Everson* stand, I would allow suits like the one plaintiffs have brought.

*3. The fact that, as a practical matter, only plaintiffs like the ones here can sue is in itself a ground for their standing.*

The rules on standing, tied to fundamental premises governing the role of courts in our system, have been evolved judicially over the years, and continue to evolve, to fit the needs of a living Constitution. The rules are not, and in their nature cannot be, mechanical generalities. "[T]he concept of standing is a necessarily flexible one, designed principally to ensure that the plaintiffs have 'such a personal stake in the out-

---

10. It was not settled plainly until Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), that the clauses here in question applied to the States under the Fourteenth Amendment, although there had been a broad intimation of this in 1923, in the volume that contains Frothingham v. Mellon. Meyer v. State of Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed.

1042. See School District of Abington v. Schempp, supra, 374 U.S. at 253–254, 83 S.Ct. 1560 (Brennan, J., concurring). While it is ancient history now, it is of passing interest to recall that there were efforts after adoption of the Fourteenth Amendment to enact a specific amendment forbidding support of religion and insuring free exercise in the States. See id. at 256–258, 83 S.Ct. 1560.

come of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions * * *'." School District of Abington v. Schempp, supra, 374 U.S. at 267 n. 30, 83 S.Ct. at 1595 (Brennan, J., concurring, and quoting from his opinion for the Court in Baker v. Carr, supra, 369 U.S. at 204, 82 S.Ct. 691.[11]) If this idea of flexibility means anything, it means that refined judgments must be made upon the nature of the interests at stake, the appropriate functions of judges with respect to such interests, and the practical consequences in our constitutional scheme of granting or denying standing in any particular case.

And so, when we deal with the subject of First Amendment freedoms, it is essential to start by recognizing (as Mr. Justice Brennan did in the passage quoted above) that it has fallen to the courts in our system to perform "the task of translating the majestic generalities of the Bill of Rights, conceived as part of the pattern of liberal government in the eighteenth century, into concrete restraints on officials dealing with the problems of the twentieth century * * *." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943). In discharging this responsibility in cases under the First Amendment, the highest Court has observed more than once that effective enforcement of the "delicate and vulnerable, as well as supremely precious" rights at stake (National Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963))

may require exceptions "to the usual rules governing standing * * *." Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965); see also United States v. Raines, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); Freedman v. State of Maryland, 380 U.S. 51, 56–57, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

One such exception, highly pertinent here, is the idea that where asserted violations of the First Amendment are in issue, a particular plaintiff or class of plaintiffs may be found to have standing because to deny it "might effectively foreclose judicial inquiry into serious breaches of the prohibitions of the First Amendment—even though no special monetary injury could be shown." School District of Abington v. Schempp, supra, 374 U.S. at 266 n. 30, 83 S.Ct. at 1595 (Brennan, J., concurring); see also Bantam Books, Inc. v. Sullivan, supra, 372 U.S. at 64–65 n. 6, 83 S.Ct. 631; National Ass'n for Advancement of Colored People v. State of Alabama, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

It is not the law generally, of course, that *someone* must have standing to bring alleged violations of the Constitution to court. On the contrary, to go no farther than the still vital teachings of Frothingham v. Mellon, it is clear that there are areas of the law where nobody has such standing. But it will be found upon analysis that in such cases, whether expressly or not, the crux of the matter is that the subject is one confided to the final authority of branches other than the judiciary—that the cases are, to

---

11. I have used earlier the quoted language from Baker v. Carr concerning this need for "concrete adverseness." The thought was not further elaborated in Baker v. Carr, and did not have to be. Similarly here, there has not been any suggestion that the suit is not genuine, robustly adverse, and likely to be fought on the kind of sharp and thorough presentation the courts must have for problems of such moment. The briefs already before us re-

flect this. We are perhaps entitled to notice that plaintiffs' lead counsel has authored or co-authored substantial volumes on the subject of the litigation. See Pfeffer, Church State and Freedom (rev. ed. 1967); Stokes and Pfeffer, Church and State in the United States (1964). There is, in a word, clear fulfillment of the practical criteria formulated by Mr. Justice Brennan, and followed by the Court in Baker v. Carr.

categorize them more precisely, non-justiciable. See, generally, Baker v. Carr, supra, 369 U.S. at 208 et seq., 82 S.Ct. 691. This, I submit, is the sufficient ground for cases like Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252, cert. denied, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960) and Pauling v. McNamara, 118 U.S.App.D.C. 50, 331 F.2d 796 (1963), cert. denied, 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964), cited by defendants, where the plaintiffs sought to enjoin nuclear testing.

Whatever may be said about nuclear testing, declarations of war and peace, and other matters confided primarily or exclusively to the "political" departments, the subject of the First Amendment is a quite different one. The high promises of that Amendment, as the years have unfolded them and given them meaning, are peculiarly for the courts to enforce. As the Court said in West Virginia State Board of Education v. Barnette, supra, 319 U.S. at 638, 63 S.Ct. at 1185:

> "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."

See also Thomas v. Collins, 323 U.S. 516, 529–530, 65 S.Ct. 315, 89 L.Ed. 430 (1945); United States v. C. I. O., 335 U.S. 106, 139–140, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) (Rutledge, J., concurring); United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

Where, as in this case, it is substantially conceded that only people like the plaintiffs before the court can complain as a practical matter, this is in itself weighty reason for doubting that notions of "standing" imported from wholly alien contexts should serve to make lifeless slogans of basic liberties.

*4. Doubts about the merits must not obscure or impair the place of the First Amendment as a barrier against the "first experiment on our liberties."*

Elaborating on the discussion under the preceding heading, I venture to suggest again (see note 4, supra) that this decision might be going the other way if plaintiffs were asserting a patent violation of the Establishment Clause—the building of churches with federal money, payment of clerical salaries, or other unthinkable measures of some similar nature. While we are together in eschewing any intimations on the merits, I think it permissible to say that plaintiffs' claim obviously falls short of any such plainly demonstrable breach. (Compare the 4–3 decision of the New York Court of Appeals on June 1, 1967, in Board of Education of Central School District No. 1 v. Allen, 20 N.Y.2d 109, 281 N.Y.S.2d 799, 228 N.E.2d 791, upholding state loans of textbooks to parochial as well as public school children.) But I think it bears special emphasis, however a later decision might distinguish what is done today, that there is no principled difference between this case and the unimaginable ones I have hypothesized.

The emphasis is fair, I think, for several reasons. First, it makes vivid the sweeping extent to which this decision on standing nullifies the Establishment Clause as a judicially enforceable protection against federal action. Similarly, it helps to demonstrate the discordance between this ruling and the deep concerns of those who gave us the First Amendment. The Founders, it is pertinent to recall again, were zealous to guard against even minute approaches to the problems of established religions that were so immediate and acute for them. They wrote with deliberate sweep not merely against laws establishing a church or religion, but against any "law respecting" that form of official coercion.

14

See McGowan v. State of Maryland, supra, 366 U.S. at 441–442, 81 S.Ct. 1101. The Supreme Court has enforced the broad prohibition with rigor. It has allowed no leeway for practices that "may be relatively minor encroachments on the First Amendment." School District of Abington v. Schempp, supra, 374 U.S. at 225, 83 S.Ct. at 1573. For, as the Court has said (ibid.): "The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.'" See also Engel v. Vitale, supra, 370 U.S. at 436, 82 S.Ct. 1261; Thomas v. Collins, supra, 323 U.S. at 530, 65 S.Ct. 315.

That fundamental approach should move us on the question of standing as well as on the substance of the problem. A decision refusing to hear a case where there may be only "minor encroachments" or no encroachments at all could come to be a plague in the perhaps unlikely, but possible, case of broader assaults upon the wall of separation. The time to make clear the scope of the protection is at the earliest moment, not when controversy may become or has become exacerbated by "the anguish, hardship and bitter strife" with which the history of this subject is so painfully filled. Engel v. Vitale, supra, 370 U.S. at 429, 82 S.Ct. at 1266. To recall again the compelling thoughts of Madison's Remonstrance, it is our duty to maintain the protection in its full, unfettered vigor, and to see that it never becomes "entangled * * * in precedents" that may weaken or choke it. Everson v. Board of Education, supra, 330 U.S. at 65, 67 S.Ct. 504.

Concepts of standing have been adapted in our time to safeguard interests far less dear than those asserted in this case. The Congress, with the approval of the Supreme Court, has allowed review of official action in matters of economic regulation at the instance of "private litigants [who] have standing only as representatives of the public interest." Scripps-Howard Radio v. Federal Communications Commission, 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942). We have witnessed the increasing appearances and ready acceptance of suitors attacking official action in the role Judge Frank identified as that of "private Attorney Generals." Associated Industries of New York State v. Ickes, 134 F.2d 694, 704 (2d Cir.), vacated and remanded, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943).[12]

It is strange, I think, for the courts to be more niggardly in defining standing before them for litigants asserting the most basic and urgent of occasions for judicial protection. If this incongruous sort of abstention is proper, it can only be because it is thought to be required by canons of judicial self-restraint that are so wise and so essential in their place. In my understanding of the First Amendment, as the Supreme Court has enforced it, those canons have no place here.

II.

Contrary to the majority, I believe that Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) neither requires nor justifies the conclusion that plaintiffs lack standing in this case. In that lawsuit—decided, incidentally, before any of the great cases that have given the First Amendment the

12. A word may be said at this point about the Government's fleeting observation that the Senate has passed a bill (S. 3, 90th Cong., 1st Sess. (1967)) which would provide for the standing plaintiffs seek in this case. The Senate has voted other such bills in the past. See S. 2097, 89th Cong., 2d Sess. (1966); H.R. 4163, 88th Cong., 1st Sess. (1963) as amended in the Senate, 109 Cong.Rec. 19357, 19891 (1963), the amendment, however, being later deleted in conference. The bills, and the discussion about them, are interesting in their reflection of how accepted it has become that the authoritative construction of the First Amendment must be sought from the Supreme Court. What I urge here is simply that there is no need for the courts to await such legislation before exercising this familiar, generally agreed, and central item of their responsibilities.

meaning we know today—Mrs. Frothingham sought to challenge the constitutionality of the Maternity Act of November 23, 1921. She sued as "a citizen of the United States and of the State of Massachusetts," and as "a tax payer of the United States."[13] She did not claim or suggest that the Maternity Act as such had any impact upon her or upon any specific rights of hers assertedly protected by the Federal Constitution. Instead, her claim was that the statute was beyond the powers of Congress; that it invaded the powers reserved to the States by the Tenth Amendment; that the financial burdens of it fell unequally upon the States; that "her constitutional rights to have taxes levied and assessed against her by the United States for those purposes alone for which the Constitution of the United States provides and to have the taxes paid by her to the United States appropriated by the Congress of the United States in the manner provided by the Constitution * * * [had] been infringed and violated;"[14] and that the effect of all this was to deprive her of her property without due process of law.

That was the case, said to be controlling here, in which the Supreme Court denied Mrs. Frothingham's standing as a taxpayer. I shall review just below the reasons given for that result in Mr. Justice Sutherland's opinion for the Court, and attempt to show why those reasons have little or no application to the present problem. First, however, it may profit to look at the matter broadly and observe what I perceive as obviously decisive differences between the cases.

What Mrs. Frothingham claimed in an action that seems on its face so absurd today was nothing less than a roving commission, based upon her status as taxpayer, to have an adjudication concerning the validity of any appropriation of money by the Congress. This meant in effect that she or any taxpayer, solely as taxpayer, would be entitled to review of practically any federal statute, since it is always—or, at least almost always—the case that appropriations are discernible as the energizing force behind official action. The Maternity Act did not touch any of Mrs. Frothingham's supposed rights, and she made no claim that it did. In a word, as Mr. Justice Harlan indicated for the Supreme Court just the other day, Frothingham v. Mellon, read without forgetting what it was about, stands for the scarcely debatable proposition "that a possible financial loss is not *by itself* a sufficient interest to sustain a judicial challenge to governmental action." Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (emphasis added).

The case before us differs sharply from Mrs. Frothingham's on the question of standing just as (and, indeed, because) it differs in the nature of the substantive interests involved. The taxpayers here claim no general right as taxpayers to review federal action. What they invoke is the specific right, defined broadly but certainly by the Establishment Clause, to be free of any "tax in any amount, large or small, * * * levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." Everson v. Board of Education, supra, 330 U.S. at 16, 67 S.Ct. at 511. As was not the case for Mrs. Frothingham, the substance of the statute in issue is for the plaintiffs before us the very heart of the matter. Of course, the essence of their asserted right is bound up, as it was for Madison and his colleagues in the framing of the First Amendment, with the forbidden use of public moneys to support religious establishments. But there is nothing here resembling a claim like Mrs. Frothingham's to a general right of review over appropriations.

13. Complaint, par. I, in the Supreme Court Record, Frothingham v. Mellon, Oct. Term 1922, No. 962, p. 2, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078.

14. Id., par. III(h), Record, p. 6.

While it centers on the use of funds, plaintiffs' suit seeks the particularized and intimately personal protection of the First Amendment from the kind of "coercion," "compulsion," and at least threatened "persecution" against which the Establishment Clause was meant to guard.

In sum, to use the words of another opinion for the Court by Mr. Justice Sutherland (citing *Frothingham*), Mrs. Frothingham's case failed because she asserted "no legal or equitable right" eligible for judicial protection, "no such interest and * * * no such legal injury" as the courts are constituted to redress. Alabama Power Co. v. Ickes, supra, 302 U.S. at 475, 478, 58 S.Ct. at 303. The plaintiffs here, on the other hand, invoke a clear and "specific limitation," Gomillion v. Lightfoot, 364 U.S. 339, 343, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); they assert now familiar "legal rights" given by the Establishment Clause; they allege a "personal stake" and "an interest of their own" no less clear and no less justiciable than the one in Baker v. Carr, supra, 369 U.S. at 204, 207, 82 S.Ct. 691, from which the quoted phrases come; they present a case that is not merely in "the conventional sphere of constitutional litigation," Gomillion v. Lightfoot, supra, at 347, 81 S.Ct. at 130, but one entitled to the "close scrutiny demanded * * * when First Amendment liberties are at issue * * *." McGowan v. State of Maryland, supra, 366 U.S. at 449, 81 S.Ct. at 1117.

I have sought in the two preceding paragraphs to state what seems to me to be the dispositive difference between this case and *Frothingham*. When we turn to the reasons given in the Court's opinion for rejecting Mrs. Frothingham's suit, the difference remains clear and undiminished.

1. In disposing of *Frothingham*, the Court began by distinguishing the case from the traditional form of taxpayer's action against a municipality. The municipal taxpayer, the Court said (262 U.S. at 486, 43 S.Ct. 597), has a "direct and immediate" interest in municipal expenditures, the relationship being (p. 487, 32 S.Ct. p. 601) "not without some resemblance to that subsisting between stockholder and private corporation." But the taxpayer's interest in the national fisc "is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." Ibid.

The quoted passages have been said to be outdated by the vastly increased impact of federal taxes and the correspondingly less "minute" share at least some taxpayers might claim in the federal as compared to municipal treasuries. 3 Davis, Administrative Law Treatise 244 (1958). But I do not stop to consider or to weigh such criticism against the unaltered position of the Supreme Court. It is quite enough for this case to repeat that plaintiffs' suit does not resemble the traditional taxpayer's suit or Mrs. Frothingham's, where the gravamen of the supposed right is nothing more than "a possible financial loss * * * by itself" from allegedly improper expenditures. Abbott Laboratories v. Gardner, supra, 387 U.S. at 1518, 87 S.Ct. 1507, 18 L.Ed.2d 681. Here, the crux of the interest is found in the First Amendment, not in the supposed loss of money as such. And so it is of no moment that the amount may be "minute," that it may be in modern currency the equivalent of as little as "three pence." Cf. Thompson v. City of Louisville, 362 U.S. 199, 203–204, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Nor is it important, whether true or not, that the amount may be to some extent "indeterminable." Nobody stopped to make the computation in *Everson* any more than the Court thought it necessary in Baker v. Carr for the plaintiffs to quantify the "debasement of their votes" (369 U.S. at 188, 194, 82 S.Ct. 691) in which inhered the asserted injury that gave them standing.

To hold, as I would, that plaintiffs like the ones here should be heard on

their First Amendment claims would not lower in any meaningful sense the barrier against standard "taxpayers' suits" emplaced by *Frothingham*. Nobody could infer from such a holding any supposed right to roam at large as a taxpayer and test impersonally the validity of any and every federal appropriation. There may be other personal interests like the one given by the Establishment Clause where a sharply identified and cherished liberty is infringed by the uses of federal funds. If so, these would be, as they should be, bases for standing in the federal court. The vital point remains that the present case, where such an interest is urged, differs on this ground from the generalized power of supervision claimed for the taxpayer in *Frothingham*.

2. Expanding upon its reasons for denying any general right of review for the federal taxpayer, the Court said in *Frothingham* (262 U.S. at 487, 43 S. Ct. at 601):

" * * * If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned."

That language does not state a ground separate from the one I have just considered, but it commands respectful attention. Read in its context, as it must be, it adds nothing to the barrier found by the majority against the suit of the present plaintiffs.

The fact that many people may share, and might sue upon, a justiciable constitutional right has never been supposed to present in itself an obstacle to suit by any of them. Cf. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Baker v. Carr, supra; Steward Machine Co. v. Davis, 301 U.S.

548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). The federal courts are open, even in the face of threatened inundation, where rights far less precious are in issue.[15] And we know in this time of class actions and huge litigations generally that the problem is manageable.

For a case like the present one, there is no substantial problem whatever. There may unquestionably be other actions of the same kind. In the end, however, there is likely to be only a single hearing and decision by the Supreme Court. *Stare decisis*—and, before that, the powers of the lower courts to stay or consolidate redundant actions—will dispose of the matter with only the customary strain of adjudication for which courts sit.

3. Undoubtedly central in *Frothingham* was the principle of the separation of powers. See 262 U.S. at 488–489, 43 S.Ct. 597. This important aspect of the opinion turns, however, on considerations no different from those I have already discussed. Here, again, the vice found in Mrs. Frothingham's case was its premise that any and every action involving appropriations should automatically be reviewable at the instance of a taxpayer. It was that untenable theory to which the Court responded when it said (p. 488, 43 S.Ct. p. 601):

" * * * We have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act."

The test thus stated, for the reasons I have urged, is met by the plaintiffs in this case.

Of course, the delicate power of judicial review inevitably starts echoes of the separation of powers. And there are broad classes of cases, "presenting [no] justiciable issue," where the power is

15. Compare the recent electrical equipment avalanche, and one of the many discussions of it in the Third Circuit Judicial Conference of last year, 39 F.R.D. 495 et seq.

absent. See Baker v. Carr, supra, 369 U.S. at 208 et seq., 82 S.Ct. 691. But this is not such a case. We have here "a judicial controversy" *(Frothingham,* 262 U.S. at 489, 43 S.Ct. 597) concerning a "right" most notably and centrally "within the reach of judicial protection \* \* \*." Baker v. Carr, supra, 369 U.S. at 237, 82 S.Ct. at 720. It should be decided on its merits.

\* \* \*

If we were free to be concerned about the comfort of judges, there would be much to say for abstention from a subject so fraught with passions that have generated many bloody chapters of history. No one can read the relevant pages of the Supreme Court reports without knowing the travail it has cost to keep alive and intact the uncompromising principle of separation for which Madison and Jefferson fought. But apart from the fact that judges' ease is not our subject, there is the consolation of high achievement in the enterprise. Accepting cases concerned arguably with the most "negligible" of alleged breaches, the Supreme Court has labored to keep the wall of separation in sound repair. That, in history's long view, is the real gain of *Everson* and the whole body of decisions. The close divisions on the Court have not reflected anything short of essential unanimity on the principle. They have shown only that in this area of profound values, where the claims of religion and conscience must be weighed against charges of official trespass, it may be agonizing work to identify "the first experiment on our liberties."

The work has gone forward in a nearly miraculous environment of reasoned and orderly deliberation. The Court has, of course, been subjected to outpourings of the vitriol it has zealously allowed under the First Amendment. But in a nation of diversities both rich and potentially disintegrating, the domains of Church and State have lived apart and in peace. In this achievement, I think, the willingness of the Supreme Court to hear and resolve claims of incipient breaches must surely be viewed as a major factor. True

religion and free conscience generally have flourished with the Court's steady enforcement of the "principle \* \* \* that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." Engel v. Vitale, supra, 370 U.S. at 432, 82 S.Ct. at 1267.

Today's decision disserves that principle.