619 F.2d 252
 AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, INC.,
Gunn, Andrew, Leigh, Doerr, Edward D.,
Settembrini, Gioele, Binns, E. Mallary, Appellants,
v.
The UNITED STATES DEPARTMENT OF HEALTH, EDUCATION AND
WELFARE, the United States of America, Northeast
Bible College, a/k/a Valley Forge
Christian College.
 No. 79-1221.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 12, 1979.
Reassigned Feb. 7, 1980.
Decided April 8, 1980.
 
 Lee Boothby (argued), Berrien Springs, Mich., John T. Acton, Willow Grove, Pa., for appellants.
 Frank A. Rosenfeld (argued), Leonard Schaitman, Attys., Dept. of Justice, Washington, D. C., Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Peter F. Vaira, Jr., U. S. Atty., Philadelphia, Pa., for Federal appellees.
 C. Clark Hodgson, Jr. (argued), Georganne Daher Terrill, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Valley Forge Christian College.
 Before ADAMS, ROSENN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The question presented in this appeal is whether an organization devoted to the separation of church and state, and several of its members suing as individual citizens, have standing to challenge the transfer of government property to a concededly religious organization.
 
 I. FACTUAL BACKGROUND
 
 2
 In August 1976, the Department of Health, Education and Welfare (HEW) conveyed 77 acres of surplus government property located in Valley Forge, Pennsylvania, as well as buildings, fixtures, and equipment situated thereon, to the Valley Forge Christian College. The property was transferred pursuant to the Federal Property and Administrative Services Act of 1949, which authorizes HEW to sell or to lease surplus government property to tax-exempt institutions for health and educational purposes.[1] In setting the sale or lease value of the property to be transferred, the Act requires the Secretary of HEW to consider any benefit that may accrue to the United States from the designated use of such property, and to grant discounts, known as "public benefit allowances," to transferees.[2] In exchange for its agreement to use the property in conformance with specified educational purposes for a period of thirty years, HEW granted to the college a 100% public benefit allowance. As a result, the property was transferred without any financial payment by the college. The total fair value of the property, acquired by the government at an estimated cost of $10,374,386.00, was stated to be $1,303,730.00 at the time of transfer.
 
 
 3
 The Valley Forge Christian College is admittedly sectarian. Operated under the supervision of the Assemblies of God, the college's primary purpose is to train leaders for church-related activities. Its curriculum is devoted to bible study, Christian service, and theology. Attendance at daily chapel service and regular participation in Christian activities is mandatory for all students.
 
 
 4
 Numerous transfers of government property to hundreds of church-denominated institutions have been authorized under the Act. As a matter of practice, HEW nearly always grants these organizations a public benefit allowance ranging from 95% to 100% of the property's estimated fair value. In this manner, HEW has in most cases relieved the benefitted religious organizations of the obligation to make financial payment for property received. Since the passage of this Act, HEW has authorized more than 650 separate transfers of surplus government property to various religious institutions. The total fair market value of government property transferred to denominationally sponsored organizations during this period amounted to more than $25,700,000.00. The initial cost of acquiring this property was over $64,494,000.00.
 
 
 5
 Americans United for Separation of Church and State, Inc., a nonprofit, tax-exempt organization claiming a membership of 90,000, and four of its individual directors, citizens and taxpayers of the United States, challenged HEW's transfer of government property to the Valley Forge Christian College. As defined by its Articles of Corporation, American United's purpose is "to defend, maintain and promote religious liberty and the constitutional principle of the separation of church and state." The plaintiffs alleged that this property transfer constituted a violation of their individual rights protected by the Establishment Clause of the First Amendment, and sought declaratory and injunctive relief to void the transfer. On the defendants' motion, the district court dismissed the suit on the ground that plaintiffs lacked standing as taxpayers to challenge a transfer of property pursuant to the Federal Property and Administrative Services Act. This appeal is from that judgment.
 
 
 6
 Although we accept the district court's conclusion that the plaintiffs lack taxpayer standing to contest the challenged conduct, we disagree with its conception of the legal identity assumed by the plaintiffs in this case. Americans United for Separation of Church and State, a nonprofit organization, is precluded by its very nature from assuming the status of taxpayer. And while the four members of this organization suing as individual plaintiffs do assert standing as taxpayers, none of them does so exclusively or as a matter of primary concern. The plaintiffs' essential contention, rather, is that the governmental conduct in question caused them individuated injury because it abridged their right protected by the Establishment Clause of the First Amendment to a Government that does not establish religion. Because the constitutional injury complained of by the plaintiffs gives them a sufficient "personal stake" in the present controversy to assure the court a "complete perspective" of the issues, and because the interest they seek to protect is arguably within the zone of interests protected by the Establishment Clause of the First Amendment, we hold that the plaintiffs possess legal standing to maintain this action. Accordingly, we will reverse the judgment of the district court.
 
 II. THE STANDING REQUIREMENT IN GENERAL
 
 7
 The concept of standing to sue derives essentially from Article III of the Constitution, which extends the federal judicial power only to certain classes of "cases" and "controversies."[3] Standing differs from the other elements of justiciability in that it focuses primarily on the status of the litigant, and only secondarily on the issues he wishes to have adjudicated.[4] Although the case or controversy requirement provides the framework within which the question of standing in federal courts must be considered,[5] Article III merely delimits the jurisdiction of federal courts; it neither defines nor is it synonymous with the doctrinal limitations of standing. As the Supreme Court has asserted, "the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."[6] Yet, the doctrine of standing reflects as well a blend of policy considerations that are "not always clearly distinguished from the constitutional limitation."[7]
 
 
 8
 Courts and commentators have been confounded for many years by the question of standing.[8] To a considerable degree, the complexities and uncertainties stem from its case-by-case course of development, which has been "more or less determined by the specific circumstances of individual situations."[9] The rules of standing have been fashioned not in the abstract, but "with specific reference to the status asserted by the party whose standing is challenged and to the type of question he wishes to have adjudicated."[10] For this reason, the Supreme Court has declared that "(g)eneralizations about standing to sue are largely worthless as such."[11] Only by distinguishing the different contexts in which the Supreme Court has attempted to give "some meaningful form . . . to the jurisdictional limitations placed on federal court power by the concept of standing,"[12] is it possible to reach some comprehension of what the requirement entails.
 
 
 9
 Early discussions by the Court regarding the question of standing were anchored in the notion of a "legally protected interest" on the part of the litigant.[13] Under this approach, standing to litigate was conditioned on a showing by the plaintiff that the challenged governmental action threatened one of his legally protected interests.[14] Only if the plaintiff demonstrated an invasion of such an interest would the courts respond to claims of serious harm or injury resulting from illegality.[15] As challenges to governmental conduct increased during the course of this century, however, observation of the "legal interest" test "became steadily more perfunctory, and the link with private-dispute settlement more tenuous."[16] Litigants increasingly recognized, and desired to attack, the impact of governmental conduct on these so-called "noneconomic" values. Judicial reluctance to deny standing to such individuals consequently led to the conceptualization of individual and organizational interests in noneconomic values as legally protected interests. As the "legal interest" test was increasingly expanded to include such values, however especially in the case of challenges brought under the Constitution and certain statutes that imposed rules of conduct on the government without specifying any private remedies for their enforcement the exercise began to lose its point, and eventually was abandoned. In two cases decided in 1970, Association of Data Processing Service Organizations v. Camp[17] and Barlow v. Collins,[18] the "legal interest" test for standing, which "had become symbolically definitive even as it was increasingly ignored,"[19] was finally overruled explicitly and replaced by a new formulation of the standing doctrine.
 
 
 10
 A. The Modern Law of Standing: Personal Injury in Fact
 
 
 11
 The modern law of standing set forth in Data Processing and Barlow and reaffirmed in the same words since, requires no more than an allegation that the challenged official action has caused the plaintiff "injury in fact, economic or otherwise,"[20] to an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[21] Requiring "injury in fact" ensures that standing to sue is conferred only on individuals having a "personal stake in the outcome" of a controversy, and not on those with merely generalized or external preferences about its outcome.[22] Personal injury to a cognizable interest of the litigant, it is felt, will assure "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions."[23] As a result, when standing is placed in issue today, the question is " 'whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue' and not whether the controversy is otherwise justiciable, or whether, on the merits, the plaintiff has a legally protected interest that the defendant's action invaded."[24]
 
 
 12
 The categories of injury that may be alleged to support a litigant's standing to sue have increased considerably since the modern formulation of the standing doctrine in Data Processing and Barlow. Various allegations of harm have been recognized by the Supreme Court as sufficient to meet the requirement of "injury in fact." The most commonly recognized "injury in fact" has been economic in nature. In Data Processing, for example, the economic interests of data processors in agency rulings allowing nationally regulated banks to compete in the data processing industry supplied the requisite personal stake for the processors to challenge the agency action. Yet the Supreme Court went out of its way "to emphasize that standing may stem from (noneconomic values) as well as from . . . economic injury."[25] In particular, the Court indicated that injury to aesthetic, conservational, recreational, and spiritual values may satisfy the "injury in fact" requirement.[26]
 
 
 13
 Dictum in Data Processing to the effect that the alleged injury necessary to confer standing need not be of an economic nature was soon fortified. In Sierra Club v. Morton,[27] the complainant averred that a road development through a National Park would adversely affect the scenery and wildlife of the area, and would impair the enjoyment of the park in the future. Although the Supreme Court denied standing because the Sierra Club had not alleged that its members would be personally injured by the development, it did not question that "this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing."[28] The Court later validated environmental injury as a basis for standing. In United States v. SCRAP,[29] a group of law students who used the public parks challenged an agency ruling allowing a railroad rate increase which they claimed would result in greater litter in the parks. Noting that the claimed injury to the environment was "far less direct and perceptible" than that at issue in Sierra Club, and that the line of causation offered was "far more attenuated," the Court nonetheless concluded that the plaintiffs had alleged "a specific and perceptible harm" sufficient to satisfy the test of injury in fact.[30]
 
 
 14
 An averment that official action violates the plaintiff's constitutional rights may also set forth a sufficient injury to meet the "injury in fact" test. In Baker v. Carr,[31] for instance, an asserted injury to voting rights supplied the basis for standing to attack the constitutionality of an apportionment scheme that allegedly diluted the relative effectiveness of the plaintiffs' right to vote. And in Abington School District v. Schempp,[32] standing to contest the constitutionality of Bible-reading in public schools was conferred on students and their parents who claimed that the practice violated their individual rights under the Establishment Clause.
 
 
 15
 Although it is now unquestioned that standing to sue may be premised on injury to noneconomic as well as economic values, "the 'injury in fact' test requires more than an injury to a cognizable interest."[33] The acceptance of new categories of judicially cognizable injury has not eliminated the basic principle that to invoke judicial power the claimant must allege personal injury that has been variously described by the Supreme Court as "particular" or "concrete," "specific" or "direct," rather than "general and abstract." Desirous to ensure that individuals most affected by the questioned activity have a role in the challenge, the Court has consistently refused to confer standing on plaintiffs seeking to vindicate merely their own generalized views regarding constitutionality, legality, or the public interest.[34] Failure to set forth individuated injury, therefore, even in the presence of a "case or controversy," deprives a litigant of standing. Yet, as the Sierra Court indicated, the fact that the asserted injury is "shared by the many rather than (by) the few does not make them less deserving of legal protection through the judicial process."[35] So long as an allegation of personal injury to a cognizable interest represents "an individuated interest of the litigant as distinguished from the polity as a whole,"[36] it supplies the "personal stake in the outcome" needed for standing regardless of how many individuals share that injury. To be individuated, "an interest need only be expressible in terms of the individual litigant's concrete satisfaction or experiences; but such satisfactions or experiences need not be unique to the litigant."[37]
 
 B. Taxpayer Standing
 
 16
 The more "distinctive and discriminating" the harm alleged by a plaintiff, and the more clearly linked it is to the action challenged, the more easily a plaintiff may meet the "injury in fact" test. When a plaintiff claims such harm, there is no need to consider what must be set forth to satisfy the standing requirement by a party who asserts no special harm, but sues rather as a taxpayer to vindicate the interests of taxpayers generally.[38] In the absence of any allegation of individuated injury, however, an individual suing in his capacity as a taxpayer may nonetheless be able to demonstrate, under certain limited circumstances, a sufficient "personal stake in the outcome" to allow him to argue the merits of the cause.
 
 
 17
 Flast v. Cohen[39] enunciated the modern law of federal taxpayer standing. As defined by the Court, the question presented there was "whether a litigant asserting only his status as a taxpayer has standing to maintain a suit in a federal court."[40] Plaintiff-taxpayers in that case disputed the expenditure of federal funds to finance instruction and materials for use in religious schools on the ground that this abridged the Establishment Clause. In granting standing, the Supreme Court set forth two rules governing its decision. First, in order to maintain a suit, a "taxpayer must establish a logical link between that status and the type of legislative enactment attacked."[41] The Court apparently believed that such link could be demonstrated only if a successful suit might possibly result in some decrease in taxes. "Thus," the Court explained, "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8 of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute."[42] Second, the taxpayer must establish a nexus between his taxpayer status and the nature of the constitutional transgression claimed. "Under this requirement," the Court declared, "the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8."[43]
 
 
 18
 Because the program attacked in Flast dealt with a substantial expenditure of tax funds, rather than an incidental payment in the administration of an essentially regulatory statute, the Court found that the plaintiff-taxpayer satisfied the first requirement. The Court then discerned, on the basis of a remark by James Madison,[44] an intent on the part of the Framers of the Constitution to protect taxpayers, as special beneficiaries, from the use of the taxing and spending power to support religion. "The Establishment Clause was designed as a specific bulwark against potential abuses of governmental power," the Court elaborated, and it "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power."[45] The Court accordingly granted the plaintiffs standing. "That the Framers could at most have intended to protect taxpayers as a means to the protection of religious liberty was inconsequential: it was enough that they were protected as secondary beneficiaries."[46]
 
 
 19
 The two-part nexus test of Flast has been criticized. It is uncertain why a taxpayer should be precluded from questioning congressional spending authorized by a constitutional provision other than the taxing and spending clause. All government disbursements and expenditures, it has been asserted, are exercises of the spending power, even if also supported by some other constitutional provision. In addition, it is often difficult to distinguish governmental action that is primarily spending from activity primarily regulatory. The Court has nevertheless "drawn a sharp if artificial distinction"[47] between attacks by taxpayers on spending programs as such and attacks on other kinds of programs. As for the distinction between specific and nonspecific limitations on the taxing and spending power, it has been forcefully argued that a taxpayer's stake in the outcome of the dispute is the same regardless of the nature of the limitation. "A person who has standing to challenge for one kind of illegality that adversely affects him," Professor Davis contends, "necessarily has standing to challenge for another kind of illegality that adversely affects him to the same extent."[48] The Supreme Court has offered no guidelines for distinguishing between specific and nonspecific limitations. And while the Court expressly left open the question whether the Constitution contains other specific limitations,[49] taxpayer standing to challenge official action has since been strictly confined to actions premised on the Establishment Clause.
 
 III. STANDING UNDER THE ESTABLISHMENT CLAUSE
 
 20
 In the present case, the district court apparently assumed that the allegation of injury to plaintiffs' economic interest in reduced taxes offered the only possible basis for standing. From this assumption, the district court decided that the plaintiffs lack standing as taxpayers under Flast, because they cannot show a logical link between their taxpayer interest and the claim sought to be adjudicated. The legislation authorizing the transfer in question was enacted pursuant to the property clause of the Constitution, which provides Congress the "Power to dispose of . . . Property belonging to the United States."[50] Relying on the suggestion in Flast that litigants asserting their interest as taxpayers have standing "to allege the unconstitutionality only of exercises of Congressional power under the taxing and spending clause," the district court concluded that the logical nexus between the asserted taxpayer interest and the disposition of the property challenged here is too strained to bring the plaintiffs within the narrow contours of taxpayer standing.
 
 
 21
 We do not dispute the district court's determination that under the law as it presently exists, individuals asserting solely their interest as taxpayers have standing to challenge only exercises of the taxing and spending power, and not actions authorized by other constitutional provisions. Inasmuch as litigants suing in the capacity of taxpayers must show that the activity in question involves substantial taxing and spending, it may well be that the plaintiffs here lack taxpayer standing. We do question, however, the assumption by the district court that the only basis advanced by the plaintiffs in support of their standing claim is, or must be, alleged injury to their interest as taxpayers.
 
 
 22
 The heart of plaintiffs' complaint is that the challenged governmental action caused "injury in fact" to their shared individuated right to a government that "shall make no law respecting the establishment of religion." Even the plaintiffs themselves would acknowledge that their allegation of taxpayer status is essentially an assumed role, set forth in response to uncertain pleading requirements. Plaintiffs have no reason to expect, nor perhaps do they care about, any personal tax saving that might result should they prevail. The crux of the interest at stake, the plaintiffs argue, is found in the Establishment Clause, not in the supposed loss of money, as such. As a matter of primary identity, therefore, the plaintiffs are not so much taxpayers as separationists, and their main concern is not a reduction in taxes, but their declared goal of separation of church and state.
 
 
 23
 As enunciated in Flast, the doctrine of taxpayer standing was not meant to qualify the general standing requirement of a "personal stake in the outcome." To the contrary, Flast's purpose was to outline a limited set of circumstances in which an allegation of financial injury in the form of increased tax liability by itself might be considered an acceptable stake on which to predicate standing, quite apart from any allegation of individuated injury to other judicially cognizable interests. Indeed, the Flast court apparently found itself forced to premise standing on the plaintiff's taxpayer interest, solely because it perceived no other allegation of injury that could supply the requisite personal stake in the outcome. The Court described its "point of reference" as well as its "starting point for analysis," to be "the standing of individuals who assert only the status of federal taxpayers."[51] As viewed by the Court, the question presented was "under what circumstances a federal taxpayer whose interest stemmed solely from the taxes he paid to the Treasury '(would) be deemed to have the personal stake and interest that impart the necessary concrete adverseness to such litigation so that standing can be conferred on the taxpayer qua taxpayer consistent with the constitutional limitations of Article III.' "[52] In no case outside the context of taxpayer suits, however, has the Supreme Court demanded a subject matter nexus between the injury asserted and the constitutional claim sought to be adjudicated. Indeed, in Schlesinger v. Reservists to Stop the War[53] the Court explicitly rejected such a broad compass for the Flast nexus requirement. For the nexus criteria developed in Flast for taxpayer standing, "were not intended as a litmus test to resolve all conceivable standing questions in the federal courts."[54] T ey were fashioned, rather, "solely as a determinant of standing of plaintiffs alleging only injury as taxpayers (to) challenge (federal legislation)."[55] The Court recently affirmed this position in Duke Power Co. v. Carolina Environmental Study Group, by expressly declaring that outside the context of taxpayers' suits, a litigant must demonstrate nothing more than "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the 'case or controversy' requirement."[56]
 
 
 24
 The enormous labor spent by the Court to extend standing to the plaintiff in Flast through the precarious opening of taxpayer standing is best understood as a function of the Court's acknowledged "point of reference" it found no allegation of injury except that claimed by the litigants in their capacity as a federal taxpayer. It was this perceived limitation in the pleadings and nothing else, we believe, which constrained the Court in Flast from deciding that the plaintiffs' interest in the establishment issue, without reference to their taxpayer status, would supply a stake sufficient to support standing. The underlying justification for according standing in Flast it seems, was the implicit recognition that the Establishment Clause does create in every citizen a personal constitutional right, such that any citizen, including taxpayers, may contest under that clause the constitutionality of federal expenditures. As previously suggested, it is because "each citizen has a personal stake in ensuring that the Government not establish a religion," that "a citizen apparently does suffer a sufficiently personal injury to confer standing when he is taxed to support a religious institution."[57]
 
 
 25
 In contrast to the construction of the plaintiffs' contentions in Flast, the litigants here do allege injury in fact to an interest other than the economic interest they share as taxpayers. They claim that the challenged action injures their important concern in the separation of church and state and that this is within the zone of interests protected by the Establishment Clause of the First Amendment. Thus, their appeal squarely presents the novel and important question posed by Justice Fortas in Flast, which the Court did not reach and thus did not decide: whether "the vital interest of a citizen in the establishment issue, without reference to his taxpayer's status, would be acceptable as a basis for (standing to bring) this (kind of) challenge."[58]
 
 
 26
 The question of "the vital interest of a citizen in the establishment issue" must be distinguished from the question of "citizen standing" as such. The Supreme Court has consistently admonished that a citizen who suffers equally with all other citizens will not be heard to raise generalized grievances about the conduct of the Government.[59] In Reservists, for example, individuals suing as citizens attempted to prevent certain members of Congress from serving at the same time as officers of the Armed Forces Reserve.[60] They alleged that the incompatibility clause of Article 1, § 6 renders members of Congress "ineligible to hold a commission in the Armed Forces Reserve during his (or her) continuance in office."[61] Holding that the plaintiff lacked standing, the Court stated: "standing to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share. Concrete injury whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution."[62] All citizens, the Court noted, share equally an interest in constitutional government. "In some fashion, every provision of the Constitution was meant to serve the interests of all."[63] Yet, to recognize "(s)uch a generalized interest" as a sufficient basis for citizen standing to enforce judicially all constitutional provisions, "simply because citizens are the ultimate beneficiaries," the Court concluded, "has no boundaries."[64]
 
 
 27
 A similar question was raised in United States v. Richardson.[65] There, a taxpayer and citizen sought to challenge a statute that allowed the Central Intelligence Agency to avoid publicly accounting for its receipts and expenditures, in alleged violation of Article 1, § 9's requirement that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." Although the Court conceded that the plaintiff had a genuine interest in the use of public funds, it found his claims "plainly undifferentiated" and "common to all members of the public."[66]
 
 
 28
 Accordingly, because he had failed to demonstrate a " 'personal stake in the outcome,' . . . or a particular, concrete injury . . . in short, something more than 'generalized grievances,' "[67] the plaintiff was denied standing. Ideological plaintiffs, with simply "a mere 'interest in a problem' ",[68] will not be permitted to assert the public interest in a constitutional claim.
 
 
 29
 The decisions in Reservists and Richardson appear to be based on the inadequate nature of the plaintiffs' alleged injury in fact. In both cases, the Court sought to distinguish the "abstract injury in nonobservance of the Constitution asserted by respondents as citizens" from what it described as "direct" or "concrete" injury.[69] As applied by the Court, however, the "injury in fact" requirement was not independent from the related inquiry regarding the interest sought to be protected. Thus, in Schlesinger, the Court noted that, unlike allegations asserting violation of "some limitation of the Constitution," in which case "it can only be a matter of speculation whether the claimed violation has caused concrete injury to the particular complainant," an allegation of "concrete injury" to "fundamental . . . rights" may supply "a personal stake . . . sufficient to support standing."[70] In similar fashion, the Court in Richardson found it "open to serious question whether the Framers of the Constitution ever imagined that general directives to the Congress or the Executive would be subject to enforcement by an individual citizen."[71] It would appear, therefore, that the Court's consistent refusal to grant "citizen standing" to ideological plaintiffs seeking to litigate the public interest has turned as much on the inadequacy of the alleged interest sought to be protected as it has on the deficiency of the injury alleged.[72]
 
 
 30
 The Supreme Court has often recognized that an allegation of "particular concrete injury" to a plaintiff's fundamental rights, as distinguished from the "abstract injury" in nonobservance of the Constitution alleged by litigants as citizens, can supply a personal stake in the outcome sufficient to support standing.[73] Thus, in Baker v. Carr,[74] an asserted injury to the plaintiff's fundamental right to vote was deemed a sufficient personal stake to support standing. And in Schempp,[75] the Court summarily affirmed the plaintiffs' standing to raise substantive challenges on the basis of the Establishment Clause. In so doing, the Court noted in particular that "the requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed."[76] Moreover, in Data Processing the Supreme Court expressly instructed that "a spiritual stake in First Amendment values (is) sufficient to give standing to raise issues concerning the Establishment Clause."[77] This is not to suggest, however, that a litigant claiming only that a contested action deprives someone else, or the public generally, of a constitutional right has averred a personal stake in a controversy sufficient to confer standing. Indeed, the requirement of an allegation by plaintiffs that they have suffered injury in fact "embodies a refusal by Article III courts to resolve disputes involving only generalized grievances, or only the rights or interests of third parties."[78]
 
 
 31
 However, the litigants in the present appeal are decidedly not ideological plaintiffs, lacking any personal stake in the controversy yet intent on adjudicating their own generalized views concerning the legality of the challenged action. On the contrary, plaintiffs here advance neither an abstract nor a generalized complaint but set forth instead a particular and concrete injury to a right that is allegedly protected by the constitutional guarantee raised. Nor do the plaintiffs rest their complaint on the claim that the disputed action deprives someone else, or the public generally, of a legal right. Their claim, rather, is that the challenged transfer of government property to a religious institution seriously injures their individual and personal constitutional right of religious liberty and separation of church and state. Unlike the general limitations at issue in Reservists and Richardson, certain other constitutional provisions, such as the First Amendment, create legal rights in individuals. Yet, unless individuals averring an encroachment of their legal rights have some recourse other than the political process for the vindication and protection of those rights, the proud claim that individual citizens have rights against the government may be emptied of significance. As the Supreme Court has stated: "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts."[79]
 
 
 32
 The claim that individual citizens are entitled to judicial enforcement of their rights does not, of course, tell us exactly what Constitutional rights individuals have against the government. But plaintiffs need not establish that they actually have a legal right under the Establishment Clause to be free from the kind of governmental conduct in question. An allegation of injury in fact to an interest protected by the Establishment Clause is all that is required for standing. Only if the court determines, after consideration of the merits, that the governmental action is barred by the Establishment Clause, will it thereby recognize legal rights in the plaintiffs. It is certainly not irrelevant to the prior determination, however, that the very first words of the Bill of Rights declare that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[80] The two clauses do not represent separate and distinct conceptions, but a unified one; together they serve the broad common purpose of religious liberty. As a means to that end, we believe it is at the very least arguable that the Establishment Clause creates in each citizen a "personal constitutional right" to a government that does not establish religion.[81] The essence of the argument, as Justice Harlan recognized, is "that freedom from establishment is a right that inheres in every citizen, thus any citizen should be permitted to challenge any measure that conceivably involves establishment."[82] As a cornerstone of our government, it may well be that the Establishment Clause should be enforceable at the demand of every individual who claims injury to an interest protected thereby. Justice Brennan, for one, has expressly rejected the suggestion that the Establishment Clause "is not one of the provisions of the Bill of Rights which in terms protects a 'freedom' of the individual. . . . The fallacy in this contention," he wrote, "is that it underestimates the role of the Establishment Clause, as a coguarantor, with the Free Exercise Clause, of religious liberty."[83]
 
 IV. CONCLUSION
 
 33
 One of the central purposes of judicial review is to restrain overreaching majorities from violating the rights of individuals that the Constitution was designed to protect. Yet, under the defendants' view, Congress could transfer to a particular religious organization such national facilities as the Naval Observatory or the Army War College, secure in the knowledge that any individual citizen attempting to challenge such action as an abridgement of his or her rights under the Establishment Clause would not even be granted standing to make the claim. As Chief Justice Marshall wrote long ago in Marbury v. Madison, "(t)he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."[84] The constitutional "injury in fact" complained of by the plaintiffs here gives them a sufficient "personal stake in the outcome" to assure a complete perspective of the issues involved. And we are convinced that the interest which the plaintiffs assert and seek to safeguard here is within the zone of interests protected by the Establishment Clause.
 
 
 34
 Accordingly, the judgment of the district court dismissing the complaint for lack of standing will be reversed, and the case remanded for proceedings consistent with this opinion.
 
 
 35
 ROSENN, Circuit Judge, concurring.
 
 
 36
 I agree with Judge Adams' analysis that Americans United for Separation of Church and State, Inc., (Americans United) has standing under the Establishment Clause to challenge the transfer of surplus government property to a religious organization. I write separately, however, because I believe there is an additional reason which requires that we find standing. Simply stated, I believe that the plaintiffs have standing because they possess the necessary adversity of interest and, as a practical matter, no one is better suited to bring this lawsuit and thus vindicate the freedoms embodied in the Establishment Clause.
 
 
 37
 The Establishment Clause, and the first amendment of which it is a part, operates to protect the rights of political minorities against abuses by political majorities. See J. Madison, Memorial and Remonstrance against Religious Assessments. Thus, the first amendment, with its protections of fundamental rights, must be enforceable by the judicial branch of government, for it is by its very nature and terms designed to protect against possible abuse by the political branch. See West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).
 
 
 38
 The first amendment is different from some provisions of the Constitution which do not depend primarily upon judicial enforcement for their efficacy and where alleged violations thereof thus do not give rise to a judicially cognizable controversy. See Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).[1]
 
 
 39
 The first amendment, however, is unlike the constitutional provisions at issue in Richardson and Schlesinger. There is no doubt that it is "subject to enforcement by an individual citizen." See United States v. Richardson, supra, 418 U.S. at 178 n. 11, 94 S.Ct. at 2947 n. 11. Furthermore, because the first amendment is designed to protect against abuses by political majorities, it need not, and indeed must not, depend upon the political process for vindication and protection.
 
 
 40
 The fundamental nature of first amendment interests and their nonmajoritarian nature is reflected in the liberalized standing rules that have been applied to overbreadth challenges under the Free Speech Clause. Within certain constraints, one whose conduct may be permissibly regulated or proscribed may, nevertheless, assert that the statute is unconstitutionally overbroad with respect to third parties not before the court. See Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). If standing were not allowed in such cases, important rights of free speech would be rendered unenforceable. The existence of an overbroad statute may deter parties not before the court from engaging in constitutionally protected conduct. That very deterrence or chilling effect might well prevent a judicially cognizable controversy from arising, thus effectively shielding the statute from review. The more effectively a statute deterred protected activity, the more likely it would be to escape judicial review. The Free Speech Clause would thereby be severely weakened.
 
 
 41
 The scope of the liberalized standing rules in the free speech area is, I suggest, governed in part by the Court's realization of the need for an available plaintiff. When an individual has himself been charged with a violation of a statute, the Court is willing to allow him to challenge it, even though his conduct is permissibly regulable, because of the Court's concern that it will not otherwise have an opportunity to examine the challenged statute. See Broadrick v. Oklahoma, supra, 413 U.S. at 612, 93 S.Ct. at 2915. The individual charged under the statute, has an obvious interest in demonstrating its invalidity. This assures the requisite adversity necessary for judicial decisionmaking.
 
 
 42
 Statutes alleged to violate the Free Speech or Free Exercise Clauses are likely to have a perceptible impact or focus upon individual conduct. Thus, even though all citizens may be said to have a generalized interest in free speech or free exercise values, that is insufficient to confer standing. There is normally an available class of likely plaintiffs better situated to challenge the offending statute. Similarly, statutes allegedly violative of the Establishment Clause may also be directed at the regulation of individual conduct. In Abington School District v. Schempp, 374 U.S. 203, 205, 83 S.Ct. 1560, 1562, 10 L.Ed.2d 844 (1963), for example, a state statute required the reading of Bible passages to public school students. There, students and their parents brought suit, challenging the statute under the Establishment Clause. The Court found that the children and their parents were directly affected by the statute and thus had standing to complain. 374 U.S. at 224 n. 9, 83 S.Ct. at 1572.
 
 
 43
 Unlike statutes allegedly violative of the Free Exercise and Free Speech Clauses, statutes alleged to violate the Establishment Clause may not have an individual impact sufficient to confer standing in the traditional sense. Rather, such statutes may have the more general effect or purpose of aiding religion. In such circumstances, there is not an available class of likely plaintiffs whose conduct has been or will be circumscribed by the existence of the offending statute and who will thus have standing to seek judicial review. In Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), however, the Supreme Court largely filled this gap by granting taxpayer standing to those challenging actions under the taxing and spending clause of the Constitution which are alleged to violate the Establishment Clause.
 
 
 44
 In the case before us, we are presented with a statute that does not arise under the taxing and spending power. Thus, I agree that there is not taxpayer standing. Furthermore, the statute at issue here is not directed at the regulation of individual conduct. Although it is possible to conceive of economic interests that might give rise to a plaintiff who meets traditional standing requirements, that will be relatively rare and is certainly not the case here.[2] Americans United is likely to be the best available plaintiff. If they do not have standing, it is probable that the transfer of property at issue here, and other similar transfers (of which there are apparently a substantial number, maj. op. at 254) would be placed beyond judicial review. In respect to such actions, the Establishment Clause would be rendered virtually unenforceable.
 
 
 45
 It is apparent that Americans United and those four of its directors named as individual plaintiffs, possess the requisite adversity of interest necessary to insure legitimate and effective judicial decisionmaking. Americans United is a non-profit organization some 90,000 strong with a historic and documented commitment to vindication of Establishment Clause interests. As stated by its Articles of Incorporation, Americans United's purpose is "to defend, maintain and promote religious liberty and the constitutional principle of the separation of church and state." Organizational purpose is, by itself, normally an insufficient basis on which to rest standing. See Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). Nevertheless, in the context of the case before us, and the need to provide a judicial forum for the vindication of Establishment Clause interests, I believe that it provides an additional indication that Americans United and the individual plaintiffs meet applicable standing requirements. Accordingly, I join Judge Adams in reversing the judgment of the district court.
 
 
 46
 WEIS, Circuit Judge, dissenting.
 
 
 47
 The majority concedes, and I agree, that the plaintiffs do not have taxpayer standing. I also agree that the rules of standing are at best far from clear. Nevertheless, it seems to me that the grant of standing to the plaintiffs runs contra to the Supreme Court's pronouncements in this complex area of the law.
 
 
 48
 Although the Court has expanded the categories of assertible injuries to include such matters as aesthetic and environmental well-being, United States v. Students Challenging Regulatory Agency Proceedings (SCRAP), 412 U.S. 669, 686-87, 93 S.Ct. 2405, 2415-16, 37 L.Ed.2d 254 (1973), it has not abandoned its insistence upon the presence of "injury in fact," Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72-74, 98 S.Ct. 2620, 2630-31, 57 L.Ed.2d 595 (1978). This factor has been said to be based on the necessity that the plaintiff have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). It has also been held at various times that injury in fact is a necessary predicate to the Article III requirement of case or controversy. Both reasons have been subjected to critical commentary.[1]
 
 
 49
 Analysis of the raison d'etre of the injury in fact prerequisite may be interesting, but it does not provide much enlightenment in resolving standing questions. No general definition of injury in fact has been particularly conclusive, with such descriptions as "specific," "concrete," and "personal" having found their way into opinions. The cases depend to a very large extent upon their factual backgrounds, furnishing but little effective guidance for future determinations.
 
 
 50
 Out of the morass that is the American law of standing, however, several principles emerge. First, a generalized grievance brought by concerned citizens seeking to enforce a particular constitutional guarantee has been deemed too abstract to satisfy the injury in fact component of standing. Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). Second, a taxpayer's standing to promote constitutional governance has been confined to situations where a specific limitation on the congressional taxing and spending power has been alleged. This narrow opening to standing was expounded in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), where a taxpayer was granted standing to challenge an expenditure of federal funds for sectarian schools on the premise that the establishment clause is a limitation on Congress's power over the fisc. But in United States v. Richardson, supra, the Court rejected an attempt to expand taxpayer standing to reach disputes over issues other than the taxing and spending power because of a lack of any causal connection between plaintiff's status and the asserted injurious conduct.
 
 
 51
 In the case at bench, the majority essentially finds a different kind of "citizen standing" derived from "(a) shared individuated right to a government that 'shall make no law respecting the establishment of religion.' " At 261. Although there is respected scholarly commentary approving that approach, it does not find support in the United States Reports.
 
 
 52
 In Flast v. Cohen, supra, Justice Fortas, in a concurrence, floated the idea that "(p)erhaps the vital interest of a citizen in the establishment issue, without reference to his taxpayer's status, would be acceptable as a basis for this challenge." 392 U.S. at 115-16, 88 S.Ct. at 1960. It is obvious that there were not enough votes approving this concept, for otherwise the majority would not have found it necessary to construct the complicated and detailed formula it used to bypass the venerable prohibition against taxpayer standing. Certainly, the opinion would have been simpler had a majority of the Court approved the Fortas concept.
 
 
 53
 It does not suffice to say that the Flast Court was limited by the plaintiffs' pleadings to a consideration only of the taxpayer issue. In the three-judge district court, Judge Frankel, in dissent, urged that the plaintiffs be given standing, not because they alleged that their tax dollars were being distributed unconstitutionally, but because they were asserting violations of the establishment clause the same argument made by the majority here. See Flast v. Gardner, 271 F.Supp. 1, 11-13 (S.D.N.Y.1967). In their brief filed with the Supreme Court, moreover, the Flast plaintiffs disclaimed that their principal motive was to keep taxes down. They sued, in their words,
 
 
 54
 "to prevent a pocketbook injury but only because that is part of what they deem a much graver injury, an injury to the right to live under a government which separates itself strictly from the church and church affairs."
 
 
 55
 Brief for Appellant at 37.
 
 
 56
 The briefs of several amici reflect the same approach:
 
 
 57
 "(T)he rights advanced here are not primarily monetary in nature. . . . (T) he dominant inducement for this action is the protection of individual and social freedom . . . ."
 
 
 58
 Brief for National Council of Churches at 9.
 
 
 59
 "Thus, as Judge Frankel suggested, an economic analysis of the plaintiff's interest is inappropriate in a case of this kind. Ibid. The proper analysis must comprehend the nature of the rights confirmed by the Establishment Clause, and the identity of the party upon whom these rights are conferred. . . . (T) he plaintiffs in this case, as citizens, contend that the Elementary and Secondary Education Act infringes the rights conferred upon them by the First Amendment. Their status as injured citizens, and nothing else, gives them the requisite interest to maintain their suit."
 
 
 60
 Brief for Americans for Public Schools at 8. It cannot be said, therefore, that the Supreme Court was not strongly urged to adopt the theory that the majority here now advances.
 
 
 61
 If as the majority suggests, however, the Flast Court felt itself bound by the pleadings, then that same limitation must necessarily apply to us as well. The amended complaint, upon which the district court reached its decision, identifies the plaintiffs as "taxpayers." The corporate plaintiff is described as an organization of taxpayers, and each individual is listed as a taxpayer who "would be deprived of the fair and constitutional use of his (her) tax dollar for constitutional purposes in violation of his (her) rights under the First Amendment . . . ." (App. 9.)
 
 
 62
 The Flast complaint also identified the plaintiffs as taxpayers and protested the use of federal funds to finance instruction in sectarian schools. Thus, there is no substantial difference between the two complaints, certainly none that would permit consideration of citizen standing in one case and not in the other.
 
 
 63
 The plaintiffs do not allege any direct injury that the transfer of the property has inflicted upon them or any direct benefit that will accrue to them as a result of the requested judicial action. Their freedom of religion is not alleged to be affected in any respect. Rather, the complaint alleges that the granting of the property is a violation of the establishment clause and asks that the conveyance be declared void or that the college be required to return the property to the government. Neither of these actions would directly affect any of the plaintiffs.
 
 
 64
 The lack of cognizable injury to the plaintiffs places them in the same posture as those in Schlesinger v. Reservists Committee to Stop the War, supra. There, the Court reiterated the requirement that the party seeking review must himself have suffered an injury and said: "Abstract injury is not enough." Id., at 219, 94 S.Ct. at 2921, quoting O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). That holding was made in the face of a complaint that sought to force members of Congress to act in conformity with the incompatibility clause "an interest shared by all citizens." Id. at 217, 94 S.Ct. at 2930. "(T)hat claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury." Id. (footnote omitted).
 
 
 65
 Similarly, in United States v. Richardson, supra, the Court repeated the necessity for the plaintiff's allegations of "particular concrete injury as a result of the operation of this statute," id., at 177, 94 S.Ct. at 2946, the statute in question being one authorizing private accounting by the Central Intelligence Agency. In that case the Court took pains to dispel the notion that standing should be conferred simply because if the plaintiff could not litigate the issue, no one could. Id. at 179, 94 S.Ct. at 2947. As the Richardson majority observed, such a situation supports the argument that the issue is one "committed to the surveillance of Congress, and ultimately to the political process." Id.
 
 
 66
 I, for one, am unwilling to believe that Congress, responsive as it is to public opinion, is likely to give away either the Naval Observatory or the Army War College.[2] To my mind, the Schlesinger and Richardson observations apply just as clearly to the generalized complaints of the plaintiffs here. Accordingly, I can find no principled basis for distinguishing the cases.
 
 
 67
 In light of this authority, I do not find persuasive the argument that the establishment clause creates a right capable of being enforced by all citizens. As Justice Harlan indicated in his Flast dissent, premising standing on a hierarchical view of constitutional commands would increase, without any logical basis, "the number of situations in which individual citizens could present for adjudication 'generalized grievances about the conduct of government.' " 392 U.S. at 129-30 n.18, 88 S.Ct. at 1968 n.18, quoting id. at 106, 88 S.Ct. at 1955 (majority opinion). Nor do other cases relied on by the majority support its position. Both Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), and Baker v. Carr, supra, are readily distinguished because the plaintiffs there suffered particularized injuries. In Schempp, the parents and their children were directly affected by the presence of classroom prayer. And in Baker, the harm alleged was the devaluation of plaintiffs' individual votes. See L. Tribe, American Constitutional Law § 3.19, at 86-87 (1978).
 
 
 68
 The majority has embraced a concept of standing presented to the Court in 1968 and not accepted by it at that time, or since. If the basic principles of standing prove to be unworkable or undesirable, then it is the Supreme Court and not a court of appeals that has the right to change them. See Hicks v. Miranda, 422 U.S. 332, 343-45, 95 S.Ct. 2281, 2288-89, 45 L.Ed.2d 223 (1975). I find no indication in Reservists and Richardson that the Court has gone beyond what Flast contained, and I would therefore affirm the district court.
 
 
 
 [1]
 40 U.S.C. § 484(k) (1976)
 
 
 [2]
 Id. 45 C.F.R. § 12 (1978)
 3 U.S.Const. art. III, § 2, states:
 The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; to all Cases affecting Ambassadors, other public Ministers and Consuls: to all Cases of admiralty and maritime Jurisdiction; to controversies to which the United States shall be a Party; to Controversies between two or more States; between a State and Citizens of another State; between citizens of different States; between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.
 
 
 [4]
 Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968)
 
 
 [5]
 Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)
 
 
 [6]
 Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), quoted in Association of Data Processing Serv. Organization v. Camp, 397 U.S. 150, 151-52, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)
 
 
 [7]
 Id. at 97, 88 S.Ct. at 1951 (quoting Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953))
 
 
 [8]
 One recent commentator has insisted that the law of standing "lacks a conceptual framework" and amounts to "little more than a set of disjointed rules dealing with a common subject." Tushnet, The New Law of Standing: A Plea for Abandonment, 62 Cornell L. Rev. 663, (1977). Another has concluded that the "whole law of standing is so confused and cluttered . . . that the lower courts and practitioners especially need Supreme Court guidance." K. Davis, Administrative Law of the Seventies § 22.00.-01, at 167 (Supp.1977)
 
 
 [9]
 United States ex rel. Chapman v. Federal Power Comm., 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918 (1953)
 
 
 [10]
 Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968)
 
 
 [11]
 Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)
 
 
 [12]
 Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968)
 
 
 [13]
 See, e. g., Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 60 S.Ct. 869, 875, 84 L.Ed. 1108 (1940); Tennessee Elec. Power Co. v. TVA, 306 U.S. 118, 137, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939); Alabama Power Co. v. Ickes, 302 U.S. 464, 479, 58 S.Ct. 300, 303, 82 L.Ed. 374 (1938)
 
 
 [14]
 Tennessee Power Co. v. TVA, 306 U.S. 118, 136-37, 147, 59 S.Ct. 366, 369, 374, 83 L.Ed. 543 (1939). The "legal interest" inquiry was a product of the traditional legal order in which a court's basic function was to settle disputes between private individuals regarding property or liberty of person. As civil litigation against government officials evolved, there remained a need to perceive an ownership claim before courts could recognize an individual whose ownership interest could be adjudicated. It was only natural for courts to seek to accommodate such litigation within the existing structure of legal thinking and language appropriate to private dispute settlement. Challenges to governmental action thus triggered judicial inquiry into whether such action had invaded the complainant's legally protected interest. Courts in effect sought guidance from other areas of the law in order to determine whether a plaintiff's alleged interest was deserving of judicial protection. Scott, Standing in the Supreme Court A Functional Analysis, 86 Harv.L.Rev. 645, 650 (1973). For an illuminating discussion, see J. Vining, Legal Identity 13-33 (1978)
 
 
 [15]
 As Justice Frankfurter elaborated: "A litigant ordinarily has standing to challenge governmental action of a sort that, if taken by a private person, would create a right of action cognizable by the courts. . . . Or standing may be based on an interest created by the Constitution or a statute. . . . But if no comparable commonlaw right exists and no such constitutional or statutory interest has been created, relief is not available judicially." Joint Anti-Fascist Refugee Comm. v. McGrath, 351 U.S. 123, 152, 71 S.Ct. 624, 638, 95 L.Ed. 817 (1951) (concurring opinion)
 
 
 [16]
 J. Vining, supra note 14, at 23
 
 
 [17]
 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)
 
 
 [18]
 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970)
 
 
 [19]
 J. Vining, supra note 14, at 26-27
 
 
 [20]
 Data Processing Serv. Organizations v. Camp, 397 U.S. at 152, 90 S.Ct. at 829
 
 
 [21]
 Id. at 153, 90 S.Ct. at 830
 
 
 [22]
 Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), quoted in Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968)
 For a discussion of the distinction between "personal" and "external" preferences see R. Dworkin, Taking Rights Seriously 234-39 (1977). External preferences need not be independent of, indeed they may reinforce, personal preferences. See Sierra Club v. Morton, 405 U.S. 727, 738, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972) ("The test of injury in fact goes only to the question of standing to obtain judicial review. Once this standing is established, the party may assert the interests of the general public in support of his claims for equitable relief.").
 
 
 [23]
 Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), quoted in Barlow v. Collins, 397 U.S. at 170-71, 90 S.Ct. at 839-40 (Brennan, J., concurring and dissenting). "We may reasonably expect," as Justice Brennan noted in Barlow, "that a person so harmed will, as best he can, frame the relevant questions with specificity, contest the issues with the necessary adverseness, and pursue the litigation vigorously." 397 U.S. at 172-73, 90 S.Ct. at 841 (footnote omitted)
 
 
 [24]
 Barlow v. Collins, 397 U.S. at 171, 90 S.Ct. at 840 (Brennan, J., concurring and dissenting) (footnote omitted) (quoting in part Flast v. Cohen, 392 U.S. at 99-100, 88 S.Ct. at 1952-1953). The discrediting of the "legal interest" test, as Professor Vining has suggested, represented "not simply an incremental development, but a shift in the axioms of legal thinking" supra note 14, at 39. "The 'legal interest' test," the Supreme Court said in Data Processing, "goes to the merits. The question of standing is different." 397 U.S. at 153, 90 S.Ct. at 830. This important distinction between whether a plaintiff is a proper party to request an adjudication of a particular issue and whether that issue itself is justiciable had been drawn by the Court two years previous in Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). Prior to that decision, however, the existence or nonexistence of a "legal interest" was not, as the Supreme Court subsequently held, "a matter quite distinct from the problem of standing." Association of Data Processing Serv. Organizations v. Camp, 397 U.S. at 153 n.1, 90 S.Ct. at 829 n.1. On the contrary, prior statements had bound together standing, the merits, and the remedy. If the plaintiff was given standing to assert his claims, his interests were legally protected; if he was denied standing, his interests were not legally protected. The separation in Data Processing and Barlow of the question of standing to sue, on the one hand, from those of the merits and the remedy, on the other, thus reflected a fundamental departure. It represented a new awareness of judicial power and a willingness to address issues and provide remedies even when "the merits do not seem to focus on the situation of a particular individual" or "no remedy restoring or protecting a person as such and by 'name' is appropriate." J. Vining, supra note 14, at 44
 
 
 [25]
 397 U.S. at 154, 90 S.Ct. at 830
 
 
 [26]
 Id
 
 
 [27]
 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)
 
 
 [28]
 Id. at 734, 92 S.Ct. at 1366
 
 
 [29]
 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)
 
 
 [30]
 Id. at 688-89, 93 S.Ct. at 2416-17
 
 
 [31]
 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)
 
 
 [32]
 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)
 
 
 [33]
 Sierra Club v. Morton, 405 U.S. at 734-35, 92 S.Ct. at 1366
 
 
 [34]
 E. g. Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166 (1974); Sierra Club v. Morton, 405 U.S. at 734-35, 92 S.Ct. at 1365-66. The Sierra Court readily conceded that "an organization whose members are injured may represent those members in a proceeding for judicial review." But it nonetheless refused to confer standing on the plaintiff organization because the Club failed to allege that it or its members would be affected in any of their activities by the challenged action. As the Court explained: "The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interest from being protected through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." Id. at 739-40, 92 S.Ct. at 1368-1369
 
 
 [35]
 Id. at 734, 92 S.Ct. at 1366
 
 
 [36]
 L. Tribe, American Constitutional Law § 3-19, at 85 (1978)
 
 
 [37]
 Id. As the Court later held in United States v. SCRAP, 412 U.S. at 687, 93 S.Ct. at 2416: "standing is not to be denied simply because many people suffer the same injury."
 
 
 [38]
 Barlow v. Collins, 397 U.S. 159, 172 n.5, 90 S.Ct. 832, 841, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring in the result and dissenting)
 
 
 [39]
 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)
 
 
 [40]
 Id. at 91, 88 S.Ct. at 1948 (emphasis added)
 
 
 [41]
 Id. at 102, 88 S.Ct. at 1954
 
 
 [42]
 Id
 
 
 [43]
 Id. at 102-03, 88 S.Ct. at 1954
 
 
 [44]
 " '(T)he same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever. (Memorial and Remonstrance Against Religious Assessments.) 2 Writings of James Madison 183, 186 (Hunt ed. 1901).' " 392 U.S. at 103, 88 S.Ct. at 1954
 
 
 [45]
 Id. at 104, 88 S.Ct. at 1954-1955
 
 
 [46]
 J. Vining, supra note 14, at 109
 
 
 [47]
 L. Tribe, supra note 36, § 3-19, at 84 n.18 (1978)
 
 
 [48]
 Davis, Standing Taxpayers and Others, 35 U.Chi.L.Rev. 601, 604 (1968)
 
 
 [49]
 Flast v. Cohen, 392 U.S. at 105, 88 S.Ct. at 1955
 50 U.S.Const. art. IV, § 3, cl. 2.
 
 
 [51]
 392 U.S. at 91, 102, 88 S.Ct. at 1953. Although the court apparently understood the plaintiffs to be premising their standing solely on their status as taxpayers and decided the case on that basis the plaintiffs in their brief to the Court did assert not only this "pocketbook injury," but also "an injury to the right to live under a government which separates itself strictly from the church and church affairs." Brief for Appellant at 37
 
 
 [52]
 United States v. Richardson, 418 U.S. 166, 205, 94 S.Ct. 2940, 2960, 41 L.Ed.2d 678 (1974) (Stewart, J., dissenting) (quoting in part Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968))
 
 
 [53]
 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706, id. at 225 n.15, 94 S.Ct. at 2934 n.15 (1974). This requirement, the Court noted, "is not appropriate on a claim of citizen standing since the Flast nexus test is not applicable where the taxing and spending power is not challenged. . . ."
 
 
 [54]
 United States v. Richardson, 418 U.S. at 205, 94 S.Ct. at 2960
 
 
 [55]
 Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 238, 94 S.Ct. 2925, 2963, 41 L.Ed.2d 706 (1974) (Brennan, J., dissenting)
 
 
 [56]
 438 U.S. 59, 79, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978) (footnote omitted)
 
 
 [57]
 Richardson v. United States, 465 F.2d 844, 865 (3d Cir. 1972) (in banc) (Adams, J., dissenting), rev'd, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). "(T)he establishment clause was surely intended to protect not merely or even primarily taxpayers as such, but all citizens of the new nation who believed in religious liberty and feared enforced conformity to a state religion; it would therefore seem to follow that any citizen should have standing in a case like Flast, since each has a logical nexus between his status as citizen and the claim that federal programs violate the first amendment." Scott, supra note 14, at 662
 
 
 [58]
 392 U.S. at 115-16, 88 S.Ct. at 1960 (concurring opinion)
 
 
 [59]
 E. g., Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974)
 
 
 [60]
 418 U.S. at 227-28, 94 S.Ct. at 2935-36. Standing in their capacity as taxpayers was denied on the basis of Flast v. Cohen, 392 U.S. 83, 102-3, 88 S.Ct. 1942, 1953-1954, 20 L.Ed.2d 947 (1968)
 
 
 [61]
 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). The incompatibility clause states: "no person holding any office under the United States shall be a member of either House during his Continuance in Office." U.S.Const. art. 1, § 6
 
 
 [62]
 Id. at 220, 94 S.Ct. at 2932
 
 
 [63]
 Id. at 226-27, 94 S.Ct. at 2935
 
 
 [64]
 Id. at 227, 94 S.Ct. at 2935
 
 
 [65]
 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974)
 
 
 [66]
 Id. at 177, 94 S.Ct. at 2946 (quoting Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (per curiam))
 
 
 [67]
 Id. at 179-180, 94 S.Ct. at 2948
 
 
 [68]
 Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972)
 
 
 [69]
 Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. at 223 n.3, 94 S.Ct. at 2933
 
 
 [70]
 Id
 
 
 [71]
 418 U.S. at 178 n.11, 94 S.Ct. at 2947
 
 
 [72]
 In a recent article, Professor Tushnet has argued that a preference by the Supreme Court for "better" plaintiffs stands as an implied limitation upon the conferral of standing. See supra note 8, at 690-93. In both Reservists and Richardson, the Supreme Court recognized a similar argument "that if respondents could not obtain judicial review of petitioner's action, 'then as a practical matter no one (could)' "; but in each case the Court emphasized that the lack of a better plaintiff was "irrelevant" to the question of standing. "The assumption that if respondents have no standing to sue, no one would have standing," the Court stressed, "is not a reason to find standing." Schlesinger v. Reservists to Stop the War, 418 U.S. at 227, 94 S.Ct. at 2935; see United States v. Richardson, 418 U.S. at 179, 94 S.Ct. at 2947. Much as the lack of a better plaintiff is insufficient by itself to confer standing on a litigant, the possible availability of a better plaintiff would also appear irrelevant to the question of an individual litigant's standing to maintain a particular claim. Whenever a party's standing is challenged the question for decision is simply whether that litigant "has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." Sierra Club v. Morton, 405 U.S. at 731, 92 S.Ct. at 1364. In the present appeal, for instance, it might well be argued that Americans United is not as "good" a plaintiff as would be a nonsectarian educational institution that had actually applied for the award of government property in question, but lost out to the Valley Forge Christian College. Yet the fact that such an organization might make a "better plaintiff" cannot justify a denial of standing to plaintiffs here inasmuch as they in fact allege injury in fact to an individuated right protected by the Constitution
 
 
 [73]
 Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); see Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 223 n.13, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974); United States v. SCRAP, 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 (1973)
 
 
 [74]
 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)
 
 
 [75]
 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)
 
 
 [76]
 Id. at 224 n.9, 83 S.Ct. at 1572 n.9
 
 
 [77]
 397 U.S. at 154, 90 S.Ct. at 830
 
 
 [78]
 L. Tribe, supra note 36, § 3-19 at 82. See Note, "Standing to Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423, 428-30 (1974)
 In case of overbreadth challenges under the free speech clause of the First Amendment, the Supreme Court has extended the concept of standing to allow individuals whose conduct may be regulated or proscribed by a statute to assert that the statute is unconstitutionally overbroad with respect to third parties not before the court. Broadrick v. Oklahoma, 413 U.S. 601 (93 S.Ct. 2908, 37 L.Ed.2d 830) (1973). Moreover, the Court has granted standing in such cases not only to one who has been charged with a violation of the statute but also to one merely threatened with such prosecution. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Even under this liberalized approach, however, the litigant seeking to challenge the allegedly overbroad statute must be either specifically charged or threatened with prosecution under that statute. A plaintiff not so charged or threatened but who nonetheless challenges such a statute lacks the personal stake in the outcome of the controversy for the conferral of standing. See Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).
 
 
 [79]
 West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). In particular, the Court indicated that: "One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." Id
 80 U.S.Const. Amend. I.
 As one constitutional scholar has argued: "It is no historical accident that the two religion-related guarantees of the Bill of Rights are stated as the very first provisions of that historic document. . . . the draftsmen of the Bill of Rights, working in the perspective of a history known to them all, put first things first." Jones, Church-State Relations: Our Constitutional Heritage, in Religion and Contemporary Society 156, 163 (H. Stahmer ed. 1963).
 
 
 [81]
 See Flast v. Cohen, 392 U.S. at 114, 88 S.Ct. at 1959 (Stewart, J., concurring)
 
 
 [82]
 Id. at 129 n.18, 88 S.Ct. at 1967 n.18 (Harlan, J., dissenting). Justice Harlan's major difficulty with the argument was that it might be extended to certain other provisions of the constitution e. g., the Ninth and Tenth Amendments. "(A)ny doctrine of standing premised upon the generality or relative importance of a constitutional command would, (he thought), very substantially increase the number of situations in which individualized citizens could present for adjudication 'generalized grievances' about the conduct of government." He conceded that these Amendments, however, may be merely "tub(s) for the whale." And he praised such a doctrine of standing for "at least be(ing) internally consistent." Id
 
 
 [83]
 Abington School Dist. v. Schempp, 374 U.S. 203, 256, 83 S.Ct. 1560, 1589, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring)
 
 
 [84]
 5 U.S. 87, 102, 1 Cranch 137, 161, 2 L.Ed. 60 (1803)
 
 
 [1]
 In Richardson the Supreme Court held that the plaintiff lacked standing to bring an action seeking to enforce the provisions of Article I, § 9, cl. 7 of the Constitution. The Court stated: "It is therefore open to serious question whether the Framers of the Constitution ever imagined that general directives to the Congress or the Executive would be subject to enforcement by an individual citizen." 418 U.S. at 178 n. 11, 94 S.Ct. at 2947 n. 11. Furthermore, the Court noted that even if a judicial remedy were unavailable, the plaintiff might still obtain relief at the polls, through the operation of the electoral process. Id. at 179, 94 S.Ct. at 2947. Similarly, the Court observed in Schlesinger that "(t)he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." 418 U.S. at 227, 94 S.Ct. at 2935
 
 
 [2]
 Judge Adams observes that:
 In the present appeal, for instance, it might well be argued that Americans United is not as "good" a plaintiff as would be a nonsectarian educational institution that had actually applied for the award of government property in question, but lost out to the Valley Forge Christian College. Yet the fact that such an organization might make a "better plaintiff" cannot justify a denial of standing to (Americans United) . . . .
 Maj. op. at 263 n. 72. I agree. I would, however, further observe that the record contains no indication that there was any applicant other than the appellee competing for the transfer of the property. Nor do I believe that there ordinarily will be such a "better" plaintiff.
 
 
 [1]
 See, e.g., Bogen, Standing Up For Flast: Taxpayer and Citizen Standing to Raise Constitutional Issues, 67 Ky.L.J. 147 (1978); Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601 (1968). See also United States Parole Commission v. Geraghty, --- U.S. ----, ----, 100 S.Ct. 1202, 1211, 63 L.Ed.2d 479 (1980) (Powell, J., dissenting)
 
 
 [2]
 The Valley Forge hospital was originally constructed in 1942 to treat wounded servicemen during World War II. As one real estate appraiser wrote, "(T)hese buildings were constructed several years ago for one purpose only, that is for an army hospital, and it is my feeling that they have little or no use, generally speaking, for other purposes." (App. 242.)